# United States Court of Appeals
## For the First Circuit

No. 21-1631

UNITED STATES OF AMERICA,

Appellee,

v.

ADILSON TEIXEIRA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Kayatta, Selya, and Gelpí,
Circuit Judges.

Gregory M. Lipper and LeGrand Law PLLC on brief for appellant.
Rachael S. Rollins, United States Attorney, and Randall E.
Kromm, Assistant United States Attorney, on brief for appellee.

March 10, 2023

**SELYA**, **Circuit Judge**. This appeal poses a vexing question as to the extent to which a judge may factor his personal knowledge of a subject into the decisional calculus. Concluding, as we do, that the court below did not stray into forbidden terrain in this regard and that the record is otherwise free from reversible error, we affirm the judgment below.

I

We briefly rehearse the relevant facts and travel of the case. In November of 2016, defendant-appellant Adilson Teixeira pleaded guilty to drug-trafficking and firearms charges. See 21 U.S.C. §§ 846, 841(a)(1); 18 U.S.C. § 922(g)(1). On February 2, 2017, the district court sentenced Teixeira to a forty-one-month term of incarceration to be followed by a three-year term of supervised release.

Teixeira served his prison sentence and was released in April of 2019. His supervised release term proved to be tumultuous: the first two years included a series of violations, revocation hearings, and consequent modifications of the term. The district court found that Teixeira had violated the conditions of his supervised release by, among other things, associating with persons involved in criminal activity, using a controlled substance, and committing a crime (operating a motor vehicle with a suspended license). The upshot was that Teixeira began serving a new term of supervised release on March 19, 2021.

Past proved to be prologue, and on July 1, 2021, a preliminary revocation hearing was held before a magistrate judge to address a new complement of alleged violations. The government asserted that Teixeira had failed a drug test, had failed to participate in a substance abuse counselling program, had possessed a firearm, and had committed a crime by possessing a firearm as a convicted felon. Following this hearing, the magistrate judge ordered Teixeira detained.

The district court held a final revocation hearing on August 10, 2021. Teixeira did not dispute the two drug-related violations, conceding that he had failed a drug test and had failed to take part in a drug counselling program. But he disputed the charges that he had possessed a firearm.[1]

At the hearing, the government called a probation officer, Julianne Robinson, as a witness. Robinson testified that she had received two recordings of Snapchat videos[2] from the Taunton, Massachusetts police department, one depicting Teixeira in a music studio holding what appeared to be a firearm and the other depicting Teixeira driving a vehicle with what appeared to

---

[1] The firearms offenses were classified as Grade A violations of supervised release, which are the most serious. See USSG §7B1.1(a)(1).

[2] Snapchat is a social media app through which users can send or post images or videos that disappear either after a recipient views them or after a certain period of time has elapsed.

be a firearm in his lap. In the second video, a man — later identified as James Martin — was sitting in the front passenger seat. Martin was a friend of Teixeira's who had a side business involving the production of music videos.

The government then called special agent Patrick Briody, a ten-year veteran of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives. When asked about the music studio video, Briody explained that he "saw what appeared to be possibly a Glock pistol with an extended magazine in it, having the characteristics of what I recognize to be a firearm." He said that the gun in the video appeared to be a Glock 26 and expounded on the particular characteristics of Glock 26 pistols. With respect to the vehicle video, he testified that "[s]imilarly, . . . the item [seen on Teixeira's lap] had characteristics consistent with what would be a firearm." Briody went on to explain that, after reviewing the videos, he interviewed Martin, who told him that the weapon Teixeira was holding in the vehicle video was one of Martin's three prop guns. Martin later provided Briody with two of his prop guns but could not produce the third. Briody testified that the two prop guns that Martin showed him were not the guns depicted in the videos.

On cross examination, Briody was presented with two photographs. Although it is not entirely clear from the record, these photographs seem to have been photographs of Martin's third

prop gun, with one of the photographs depicting the weapon with an extended magazine. Briody examined the first photograph and stated that he "would say that could be a firearm" but "it could be a replica." It was, however, "definitely different" than the weapon depicted in the music studio video and "would appear to be different" than the weapon depicted in the vehicle video. He also testified that the gun shown in the second photograph was inconsistent with the characteristics of the guns depicted in the videos.

To buttress its case, the government presented an affidavit from Briody that had been executed in support of an application for a warrant to search Teixeira's cellphone. Briody testified that the search related to a separate investigation into firearms trafficking between Ohio and Massachusetts. The affidavit relied on electronic communications (text messages) between Teixeira and an alleged co-conspirator, which appeared to discuss the trafficking of firearms. The affidavit also included the summary of an interview that Briody had conducted with a man in Ohio labelled K.M., who the affidavit stated had admitted to purchasing firearms in Ohio for resale by the co-conspirator in Massachusetts. And in addition, the affidavit described the

movement of funds by means of Cash App[3] between Teixeira and the co-conspirator and between Teixeira and K.M.

Teixeira's counsel objected to the admission of the affidavit on the ground that it included "communications from text messages from another phone from another gentleman who apparently is a cooperator or a coconspirator" and "interviews with a gentleman in Ohio who's not before the Court." In counsel's view, the affidavit "contain[ed] hearsay evidence," and counsel complained that he could not "cross-examine an affidavit. Under Rule 32.1, I'm entitled to inquire into adverse witnesses." The court responded that "[t]he confrontation clause doesn't apply in a probation violation hearing," overruled the objection, and admitted the affidavit. Although Teixeira's counsel cross-examined Briody, he did not elicit any testimony from him concerning the Ohio investigation.

In his defense, Teixeira called Martin, who testified that he had produced the Snapchat videos. He asserted that the guns depicted in the videos were props.

The district court concluded that the government had shown by a preponderance of the evidence that at least one of the weapons depicted in the videos was a real firearm and that,

---

[3] Cash App is a mobile app for peer-to-peer money transfers.

- 6 -

therefore, Teixeira had violated the conditions of his supervised release:

> I am convinced, and here I am relying principally on the agent's opinion, especially with respect to the Glock 26. Perhaps I shouldn't know this, but I am a firearm[s] owner, and I actually know these guns pretty well; and that is a Glock 26 in my judgment, at least by a preponderance of the evidence, as I understand my own opinion being corroborated and relying on the agent's testimony. I do credit it, and, therefore, I do find that there is a violation of conditions, and I'm going to revoke supervised release.

Having made this determination, the court sentenced Teixeira to a two-year term of imprisonment. This timely appeal followed.

## II

A district court may revoke a term of supervised release if the government proves by a preponderance of the evidence that the releasee violated a release condition. See United States v. Colón-Maldonado, 953 F.3d 1, 3 (1st Cir. 2020); 18 U.S.C. § 3583(e)(3). The Federal Rules of Evidence do not apply in revocation proceedings, but the evidence presented must be reliable. See United States v. Portalla, 985 F.2d 621, 622 (1st Cir. 1993).

Teixeira's claims of error all relate to the district court's determination that the government proved, by a

preponderance of the evidence, that he possessed a firearm (in violation of conditions of his supervised release). Teixeira challenges the judge's reference to his (the judge's) knowledge of firearms, the admission of the affidavit, and whether the violation was shown by a preponderance of the evidence. We consider these interrelated claims sequentially, mindful that the district court's determination rested upon a finding that the videos showed Teixeira handling one or more real firearms.

**III**

Teixeira's most loudly bruited claim is that the district court's reference to its own familiarity with firearms during its ruling at the conclusion of the revocation hearing was in error. We divide our discussion of this claim into two parts.

**A**

Our starting point is the standard of review. Preserved claims of error arising out of a judge's handling of revocation proceedings are typically reviewed for abuse of discretion. See United States v. Mulero-Díaz, 812 F.3d 92, 97 (1st Cir. 2016). Here, however, the government insists that Teixeira's failure to object to the district court's statements below relegates this claim of error to plain error review.[4] Teixeira responds that he

_____

[4] Review for plain error is a "heavy burden." United States v. Correia, 55 F.4th 12, 41 (1st Cir. 2022). Under that standard, the appellant must prove "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's

- 8 -

had no meaningful opportunity to object to the district court's statements, which were made at the conclusion of the revocation hearing as part of the court's oral decision.

When a party fails to make a contemporaneous objection below, a counterpart claim of error is ordinarily subject to plain error review on appeal.  See United States v. Franklin, 51 F.4th 391, 400 (1st Cir. 2022).  But that rule is not absolute.  If a party did not have a fair opportunity to object to a particular ruling below, a counterpart claim of error is not relegated to plain error review.  See, e.g., United States v. Mojica-Rivera, 435 F.3d 28, 35 (1st Cir. 2006); Fed. R. Crim. P. 51(b).  For an opportunity to object to be sufficient, it "must have arisen prior to the trial court's entry of judgment."  United States v. Rodriguez, 919 F.3d 629, 634 (1st Cir. 2019).  The "mere possibility that an aggrieved party might be able to file a motion for reconsideration is not the functional equivalent of the opportunity to object."  Id.

In this instance, the district court did not refer to its own knowledge of firearms until the conclusion of the hearing when it was rendering a bench decision.  Teixeira had no reason to anticipate that such a statement would be forthcoming.  And once

---

substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

its bench decision was announced, the court immediately shifted gears and went on to a different phase of the proceeding (the sentence to be imposed). The hearing ended soon thereafter.

Taking a practical view of the circumstances, we conclude that Teixeira did not have a fair opportunity to object, on the spot, to the judge's allusion to his personal knowledge of firearms. When making his ruling that a violation had occurred, the judge did not invite comments from the lawyers but, rather, proceeded immediately to the separate question of the sentence to be imposed. Interrupting a judge in mid-stride is risky business for a lawyer, and Teixeira's counsel was caught between a rock and a hard place. We hold, therefore, that Teixeira's claim of error is not relegated to plain error review. Our review, instead, is for abuse of discretion.

**B**

We turn next to the merits. We start by acknowledging that a judge presiding over a revocation hearing must act in two roles when deciding whether a violation has occurred: the judge must be both an "unbiased neutral arbiter[]" and a factfinder. United States v. Ayala-Vazquez, 751 F.3d 1, 28 (1st Cir. 2014). In neither of these capacities is it permissible for a judge to undertake his own extrajudicial investigation of the facts. A judge may not, for example, unilaterally reach out to witnesses, make an ex parte trip to view the scene of the dispute, or undertake

his own fact-gathering outside of court. See Lillie v. United States, 953 F.2d 1188, 1189-90 (10th Cir. 1992); see also State v. Malone, 963 N.W.2d 453, 464-65 (Minn. 2021); State v. Baker, 667 P.2d 416, 418 (Mont. 1983). So, too — apart from facts susceptible to judicial notice, see Fed. R. Evid. 201(b) — it is impermissible for a judge to consider evidence that has not been introduced. See United States v. Berber-Tinoco, 510 F.3d 1083, 1091 (9th Cir. 2007); Fox v. City of W. Palm Beach, 383 F.2d 189, 194-95 (5th Cir. 1967); cf. Warger v. Shauers, 574 U.S. 40, 51-52 (2014) (discussing types of knowledge that jury may not consider when finding facts). If a judge oversteps these bounds, the judge, in effect, impermissibly assumes the role either of a witness, see United States v. Paiva, 892 F.2d 148, 158 (1st Cir. 1989), or of an advocate.

The rule, though, is more easily stated than applied. After all, it is always permissible for a judge, acting in his capacity as a factfinder, to use his knowledge and experience to assess the credibility of witnesses and to evaluate the evidence. See Hersch v. United States, 719 F.2d 873, 878 (6th Cir. 1983). But applying one's knowledge in assessing whether a fact is adequately proven is not the same as introducing a new fact into evidence. Just as jurors may permissibly rely on their knowledge and experience to evaluate evidence, see United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992), so may a judge.

- 11 -

Here, Teixeira labors to portray the district judge as having strayed into forbidden terrain. He characterizes the judge's statements as "relying on personal evidence" from "personal observations about his own, private gun collection" and "comparing his own firearms to the objects depicted in the video[s]." Those actions, Teixeira complains, "flouted settled limits on judges' ability to rely on their own evidence or investigation."

We reject Teixeira's plaint. A judge, sitting as a factfinder, is allowed — indeed, obliged — to bring to bear his own knowledge and experience in evaluating the evidence admitted in the case. See Hersch, 719 F.2d at 878. There is nothing in the record to suggest that the judge in this case exceeded the bounds of that authority. Fairly read, the record belies Teixeira's assertion that the judge relied upon "a specific comparison based on evidence not shared with the parties." Nor is there anything to suggest that the judge either conducted an independent investigation into facts pertinent to the case or introduced any new evidence into the decisional calculus. The judge — in his own words — "rel[ied] principally on the agent's opinion" in reaching the conclusion that at least one of the guns was real. We find nothing amiss in the fact that the judge's personal knowledge and experience informed his assessment of the

evidence and — as the judge stated — "corroborated" his decision to credit Briody's testimony.

Teixeira rejoins that our opinion in Chart House, Inc. v. Bornstein, 636 F.2d 9 (1st Cir. 1980), demands a contrary result. We disagree.

In that case, the district court denied a preliminary injunction sought by the holder of a registered service mark seeking to enjoin another business's use of a similar name. See id. at 10. The court had been presented with detailed evidence tending to show intent to sow confusion, but concluded summarily that there was "little likelihood of confusion between the two establishments." Id. We reversed, explaining that the district court had failed to make any adequate or accurate findings as to the evidence. See id. at 10-11.

At the same time, we "note[d] our concern" regarding the judge's commentary during the hearing, in which he extemporized: "I don't know how many times I drove by [the defendant's business], and I was never tempted to stop — . . . . It struck me as one of those selfcontained apartment units . . . ." Id. at 10, 11 n.4 (alterations in original). We expressed our disapproval, stating that for a trial court "to interject its personal evidentiary observations is against basic principles" and that, in any event, its personal conclusions contradicted the record evidence. Id. at 10-11, 11 n.4.

Teixeira argues that the district court's conduct in this case rests on an even more porous foundation: the district court's observations in Chart House, the argument goes, were at least based on its perusal of public roads, rather than a private collection of firearms. See id. at 10. Teixeira's argument, however, glosses over a critical distinction between Chart House and the case at hand. In Chart House, the court had gained specific extrajudicial knowledge of the evidence by independent investigation (driving by the defendant's business) and used that information to assess the likelihood of confusion. See id. Here, by contrast, it is clear from the district judge's statements that he undertook no independent investigation but, rather, simply applied his previously acquired knowledge of a particular subject to the case before him. Put another way, the judge did no more than use his own background knowledge and experience to assess the evidence introduced in the case. That was the judge's job, and we discern no abuse of the district judge's discretion in his statements regarding his knowledge of firearms.

**IV**

Teixeira next assails the admission of Briody's affidavit, which incorporated text messages between Teixeira and an alleged co-conspirator and a summary of Briody's interview with K.M. Teixeira submits that the admission of the affidavit abridged his rights of confrontation and due process. See U.S. Const.

- 14 -

amends. V, VI.  Relatedly, Teixeira asserts that the district court abused its discretion in admitting the affidavit without conducting the balancing required by Federal Rule of Criminal Procedure 32.1(b)(2)(C).  Had this balancing been conducted, he submits, the affidavit would have been excluded.

## A

We start with Teixeira's constitutional claims.  His principal plaint — that his right to confrontation was abridged — implicates the Sixth Amendment.  See U.S. Const. amend. VI. Because the district court treated Teixeira's argument as referring to the Sixth Amendment, we treat this claim as preserved. Cf. United States v. Rivera-Berríos, 968 F.3d 130, 134 (1st Cir. 2020) (explaining that to preserve a claim of error, "[i]t is enough if the objection is 'sufficiently specific to call the district court's attention to the asserted error'" (quoting United States v. Soto-Soto, 855 F.3d 445, 448 n.1 (1st Cir. 2017))).  Our review, therefore, is de novo.  See United States v. Rondeau, 430 F.3d 44, 47 (1st Cir. 2005).

Even so, we need not linger long over Teixeira's claim. The short answer to it is that a releasee does not have a Sixth Amendment right to confront adverse witnesses during revocation proceedings.  See Franklin, 51 F.4th at 396.  Instead, a more limited confrontation right applies during revocation proceedings through the Federal Rules of Criminal Procedure.  See Fed. R. Crim.

P. 32.1(b)(2)(C); see also Rodriguez, 919 F.3d at 635. Teixeira invites us to reconsider this legal framework in light of the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004). We decline this invitation. Given the special nature of revocation proceedings, see, e.g., Rondeau, 430 F.3d at 47, there is no reason to think that a long line of precedents developed over time should be discarded now. No other court has extended Crawford to revocation proceedings, see, e.g., Rondeau, 430 F.3d at 47-48, and we see no principled basis for us to blaze a new trail.

Teixeira also hints at a Fifth Amendment claim for denial of due process. See Morrissey v. Brewer, 408 U.S. 471, 489 (1972). This claim, though mentioned, is undeveloped and unaccompanied by pertinent authority. It is the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). So it is here.

**B**

This leaves Teixeira's claim under Federal Rule of Criminal Procedure 32.1(b)(2)(C). In revocation proceedings, releasees have a limited right of confrontation, see Rodriguez, 919 F.3d at 635, under which a releasee does not have a right to question a witness against him if "the court determines that the interest of justice does not require the witness to appear," Fed.

R. Crim. P. 32.1(b)(2)(C); see United States v. Fontanez, 845 F.3d 439, 443 (1st Cir. 2017).  To determine whether the interests of justice require a particular witness to appear, the court must "balance 'the releasee's right to confront witnesses with the government's good cause for denying confrontation.'"  United States v. Marino, 833 F.3d 1, 5 (1st Cir. 2016) (quoting Rondeau, 430 F.3d at 48).  In this process, the court should "weigh both the apparent reliability of the hearsay evidence and the government's proffered reason for not producing the declarant." Rodriguez, 919 F.3d at 635 (quoting Fontanez, 845 F.3d at 443).

Teixeira contends that the admission of the affidavit transgressed the strictures of Rule 32.1.  Because this contention was made below, our review ordinarily would be for abuse of discretion.  See Rondeau, 430 F.3d at 48.  Under that multi-faceted standard, "we examine the district court's legal conclusions de novo, its findings of fact for clear error, and its judgment calls with considerable deference."  Franklin, 51 F.4th at 396.

But here, there is a rub.  The record makes manifest that the district court did not explicitly undertake the balancing that Rule 32.1(b)(2)(C) contemplates with regard to the statements within Briody's affidavit.  Teixeira maintains that the court's failure explicitly to perform this balancing is reversible error in itself.  The government responds that the district court was not required to subject the text messages to balancing because

they are not hearsay and that the court's failure to undertake an explicit balancing with respect to K.M.'s statements was in any event harmless error. We address these two types of evidence separately.

## 1

We first address the text messages between Teixeira and the alleged co-conspirator. The government argues convincingly that these text messages fall within either or both of two hearsay exclusions: statements of a party opponent and/or statements not offered for the truth of the matter asserted. See Fed. R. Evid. 801(d)(2)(A), (c)(2).

This court has not yet determined whether a third-party statement that falls under a hearsay exclusion must be subjected to Rule 32.1 balancing. But common sense instructs — and the few cases to have considered the issue confirm — that a practice crafted to evaluate the admissibility of hearsay evidence should not be applied to evidence that is not hearsay. See, e.g., United States v. Falls, 960 F.3d 442, 445 (7th Cir. 2020); cf. United States v. Walter, 434 F.3d 30, 34 (1st Cir. 2006) (holding that Confrontation Clause is not implicated in circumstances involving non-hearsay evidence). We therefore hold that a third-party statement that falls within a hearsay exclusion need not be

subjected to Rule 32.1 balancing prior to its admission in a revocation hearing.[5]

In the case at hand, the text messages from Teixeira are not subject to balancing because they are statements of a party opponent. See Fed. R. Evid. 801(d)(2)(A); see also Walter, 434 F.3d at 34. The text messages of the alleged co-conspirator are also exempt from balancing under Rule 32.1: those messages were not offered for their truth but, rather, to provide context for Teixeira's messages. As such, they are not hearsay evidence. See United States v. Pena, 24 F.4th 46, 61 (1st Cir. 2022); see also Fed. R. Evid. 801(c)(2).

That ends this aspect of the matter. We conclude that the district court did not abuse its discretion by failing to conduct an explicit Rule 32.1 balancing with respect to the text messages.

---

[5] We note that there is disagreement among the circuits as to whether a finding that a proffered statement falls within a hearsay exception — as opposed to an exclusion — renders Rule 32.1 balancing unnecessary. Compare Valdivia v. Schwarzenegger, 599 F.3d 984, 988-90 (9th Cir. 2010) (holding that Rule 32.1 balancing is required if statement falls within established hearsay exception), with United States v. Aspinall, 389 F.3d 332, 343-44 (2d Cir. 2004) (holding that Rule 32.1 balancing is "inapplicable" if statement falls within established hearsay exception), abrogated on other grounds by United States v. Booker, 543 U.S. 220 (2005). We have not yet spoken to the issue, and we have no occasion to do so today.

We turn next to K.M.'s statements (included within the affidavit), which the parties seem to agree were subject to Rule 32.1 balancing. To begin, we hold that the district court's failure to make an explicit finding as to the balancing required by Rule 32.1 is not per se reversible error. See United States v. Aspinall, 389 F.3d 332, 343 (2d Cir. 2004), abrogated on other grounds by United States v. Booker, 543 U.S. 220 (2005); see also Franklin, 51 F.4th at 401. When — as in this case — the district court fails to make an explicit finding with respect to Rule 32.1 balancing and admits the third-party statements anyway, we first ask whether the record may fairly be read to show that the court implicitly performed such a balancing. See Franklin, 51 F.4th at 401. If the answer to that first question is in the affirmative, we then review the decision to admit the statements under the customary abuse-of-discretion standard. See Marino, 833 F.3d at 7. But if the answer is in the negative, we must find error and proceed to conduct a harmless-error analysis. See United States v. Cintrón-Ortiz, 34 F.4th 121, 125 (1st Cir. 2022).

In this instance, it is not immediately apparent whether the court below undertook an implicit Rule 32.1 balancing with respect to K.M.'s statements. Here, however, we can leave that question unresolved and assume, favorably to Teixeira, that the court did not implicitly perform such a balancing. Even so — as

we shall explain — its error was harmless. We thus turn directly to that inquiry — an inquiry that requires us to "weigh both the apparent reliability of the hearsay evidence and the government's proffered reason for not producing the declarant." Rodriguez, 919 F.3d at 635 (quoting Fontanez, 845 F.3d at 443).

To start, K.M.'s statements are characterized by compelling indicia of reliability. Importantly, the statements were given in the context of an interview with a federal agent and implicated K.M. in illegal arms trafficking. The fact that the statements were against K.M.'s interest is strongly suggestive of their reliability. See United States v. Mosley, 759 F.3d 664, 668 (7th Cir. 2014). What is more, K.M.'s account is consistent with the text messages about plans for obtaining firearms in Ohio for resale in Massachusetts and the Cash App charges. Consistency of the challenged statements with other evidence supports a finding of reliability. See Fontanez, 845 F.3d at 443; see also Rondeau, 430 F.3d at 48-49.

Teixeira struggles to throw shade on the reliability of K.M.'s statements. He claims, in a conclusory fashion, that search warrant affidavits are "prone to error" and, thus, inherently unreliable. This generalization, though, is of dubious force. Shaming search warrant affidavits on a categorical basis is no more persuasive than arguing, say, that all police officers are liars or that all criminal defendants are inherently incredible

- 21 -

witnesses.  Each search warrant affidavit is distinctive and —
like any other affidavit — must be judged on its own merits.

Next, Teixeira points out that the Ohio investigation
never resulted in charges against him.  We agree, generally, that
reliance on allegations of uncharged conduct cannot take the
government very far.  Here, however, the government did not rely
on the mere fact of the investigation to imply that Teixeira was
guilty of arms trafficking.  Rather, the government relied on the
communications described in the affidavit to show that Teixeira
was communicating with others about buying firearms, making it
more likely that the items depicted in the videos and photographs
were real guns.  Seen in this light, those communications were
relevant, as circumstantial evidence, to the gravamen of the
revocation proceedings even though the investigation did not
result in substantive-offense charges against Teixeira.  Whether
or not Teixeira's activities were unlawful was beside the point.

Of course, we also must examine the other component of
the balancing test:  the government's reason or reasons for not
producing the declarant. See Rodriguez, 919 F.3d at 635.  Teixeira
notes that the government never expressly articulated any reason
for not producing K.M.  But this is thin gruel:  the reasons are
apparent.

First and foremost, the unchallenged evidence shows that
K.M. resides in Ohio.  The logistical problems in hauling an Ohio

resident to Massachusetts for a revocation hearing require no elaboration. As we have said, "'the difficulty and expense of procuring witnesses from perhaps thousands of miles away' is a paradigmatic example of the type of situation that might call for the admission of hearsay evidence at a revocation proceeding." Marino, 833 F.3d at 5 (quoting Gagnon v. Scarpelli, 411 U.S. 778, 782 n.5 (1973)); see also Fontanez, 845 F.3d at 444. Here, moreover, there is a second equally obvious reason: the government may well be reluctant to call as a witness in a revocation proceeding a gun dealer who has been cooperating with it in an arms-trafficking investigation.

The bottom line is that the evidence in the affidavit was reliable and there were good reasons why the government did not call K.M. to testify in person. Given these conclusions, we hold — with a high degree of confidence — that the failure explicitly to conduct the required Rule 32.1 balancing was, at worst, harmless error. See United States v. Sasso, 698 F.3d 25, 29 (1st Cir. 2012) (explaining that — for trial errors that are not of constitutional magnitude — the harmless-error standard "allows a conviction to stand, error notwithstanding, as long as it can be said 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error'" (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946))).

## C

We add a coda. Although we have upheld the revocation order in this case despite the district court's failure to make the explicit balancing determination that Rule 32.1(b)(2)(C) contemplates, we do not gainsay the importance of such explicit determinations. We urge the district courts — when presiding over revocation proceedings — to take care to make explicit balancing determinations.

## V

Teixeira's final claim proceeds along two strands: that the district court's factual findings were clearly erroneous and that the government has not carried its burden of demonstrating the firearms violation by a preponderance of the evidence. These strands are inextricably intertwined, and we treat them as a single claim of error.

We review a district court's decision to revoke supervised release for abuse of discretion and the "underlying finding of a violation of supervised release for clear error." United States v. Wright, 812 F.3d 27, 30 (1st Cir. 2016). A determination that a district court committed clear error requires that, "on the whole of the record, we form a strong, unyielding belief that a mistake has been made." Franklin, 51 F.4th at 399 (quoting United States v. Padilla-Galarza, 990 F.3d 60, 73 (1st Cir. 2021)). In this review, we are constrained to interpret the

evidence in the light most hospitable to the disputed finding and to recognize that "credibility is largely a matter for the factfinder." United States v. Oquendo-Rivera, 586 F.3d 63, 67 (1st Cir. 2009).

We discern no clear error in the district court's factual findings. The court made pellucid that it was "relying principally on the agent's opinion." In that testimony, Briody affirmed that both weapons shown in the videos had characteristics that he recognized as consistent with those of real firearms. Moreover, he furnished detailed descriptions comparing the depicted firearms with real firearms. The decision to credit Briody's testimony was quintessentially a decision for the factfinder, see id., and the court did not clearly err in crediting Briody's testimony.

Teixeira suggests that the district court "misstated" Briody's testimony with respect to whether the guns were real. But any equivocation on Briody's part was (as has been said of beauty) more in the eye of the beholder: although Briody admitted that discerning whether a firearm is real or fake from a photograph or video is "difficult," he stated that he saw, in the music studio video, an item that had "the characteristics of what I recognize to be a firearm." So, too, Briody vouchsafed that, in the vehicle video, "the item had characteristics consistent with what would be a firearm."

- 25 -

We add, moreover, that Briody's testimony included not just his assessment of the video evidence but also his description of his interviews with Martin and his attempts to obtain Martin's prop guns. Briody testified that Martin was unable to produce any prop guns that resembled the guns featured in the videos. Briody's testimony in this regard was unequivocal: none of the three prop guns that Martin provided — two examined on the spot by Briody and one depicted in a photograph introduced at the hearing — were the same as the guns shown in the videos.

To conclude that a supervised release violation has occurred, "the district court need not point to direct evidence but, rather, may rely on reasonable inferences drawn from the evidence." Rodriguez, 919 F.3d at 637. "The inferences so drawn 'need not be compelled but, rather, need only be plausible.'" Id. (quoting United States v. Nuñez, 852 F.3d 141, 146 (1st Cir. 2017)). Nor is it clear error to discredit an alternative explanation which is lacking in evidentiary support or otherwise unpersuasive. See United States v. Brewster, 1 F.3d 51, 55 (1st Cir. 1993).

The upshot is that the government supplied evidence from which reasonable inferences could be drawn that one or more of the weapons depicted in the videos was real. We cannot say that the court clearly erred either in crediting that evidence or in

crediting an expert who testified that he believed the firearms in the videos were real guns based on a detailed comparison.

Teixeira resists this conclusion. He argues that the court erred in "overlooking other factors reinforcing the lack of basis to determine whether the purported firearm was a real firearm." Chief among these factors, Teixeira says, is the government's failure to produce or inspect the firearms depicted in the videos.

This argument will not wash. The court did not clearly err in relying on video evidence and expert testimony to reach its conclusion despite the absence of the actual guns. See Franklin, 51 F.4th at 398 (holding that government's failure to introduce specific type of substantiating evidence "does not diminish the force of the corroboration that is present"); see also United States v. Viloria-Sepulveda, 921 F.3d 5, 9-10 (1st Cir. 2019) (finding no error in district court's reliance on photographs of firearms to support upwardly variant sentence). And to cinch the matter, we have no reason to believe that the government's failure to produce the particular firearms shown in the videos was overlooked by the district court. The fact that the court did not address that factor specifically in its ruling does not mean that the court ignored it; it instead may mean that the court considered it and concluded that it was unpersuasive. A district court need not articulate its conclusions as to every jot and tittle of

evidence in making a determination as to a supervised release violation, and the fact that the court did not do so here cannot compel a finding of clear error.

## VI

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed**.