# United States Court of Appeals
## For the First Circuit

No. 21-1735

UNITED STATES OF AMERICA,

Appellee,

v.

HECTOR E. NAVARRO-SANTISTEBAN, A/K/A PEPITO, A/K/A PEPE JR.,
A/K/A HECTOR E. NAVARRO-SANTIESTEBAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Montecalvo, Circuit Judges.

José David Rodríguez, with whom Franco L. Pérez-Redondo,
Assistant Federal Public Defender, and Eric Alexander Vos, Federal
Public Defender, were on brief, for appellant.

Gregory B. Conner, Assistant United States Attorney, with
whom Maarja T. Luhtaru, Assistant United States Attorney, W.
Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, were on brief,
for appellee.

September 29, 2023

**MONTECALVO, Circuit Judge**.  Héctor Navarro-Santisteban ("Navarro") appeals from a decision of the federal district court revoking his term of supervised release and ordering him to return to prison for an additional two years.  The revocation followed the court's finding that Navarro made unlawful death threats in violation of a condition of his release barring the commission of a new crime.  Navarro contends that the court erred by admitting and considering his probation officer's hearsay testimony over his limited confrontation right without first weighing whether it was in the interests of justice to do so.  The government concedes that the district court erred but claims the error was harmless. We agree with the government that the error was harmless, and we therefore affirm the revocation.  However, because we conclude that the error may have affected the court's decision to impose an upwardly variant sentence, we vacate Navarro's sentence and remand to the district court for resentencing on the proper record and consistent with this opinion.

## I. Background[1]

In 2016, Navarro received a sixty-month prison sentence and eight years of supervised release for conspiracy to possess with intent to distribute cocaine within 1000 feet of a protected location in violation of 21 U.S.C. §§ 841(a)(1), 846, and 860.

---

[1]    We draw our recitation of the facts from the district court record.

Navarro completed his custodial sentence and was placed on supervised release in February 2020. On May 31, 2020, the United States Probation Office for the District of Puerto Rico ("Probation") learned that Navarro had made death threats to members of his family and that, following involvement by the Puerto Rico Police Department, a criminal complaint had been filed in connection with the incident. Though Navarro was never arrested or charged, Probation moved to initiate revocation proceedings based on the incident. Probation alleged several violations including that Navarro had made unlawful threats in violation of his supervised-release condition that barred him from "commit[ting] another federal, state[,] or local crime."[2] Navarro admitted to the violations, and on September 2, 2020, the district court revoked his term of supervision and sentenced him to nine months' reincarceration to be followed by seven years' supervised release.

Navarro was placed back on supervision in March 2021. On June 11, 2021, after three months in a residential reentry

---

[2] Probation also alleged that Navarro had violated the conditions of supervised release requiring him to (1) answer truthfully to all inquiries by the probation officer and follow all instructions of the probation officer; (2) notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer; and (3) participate in a mental health treatment program.

center, Navarro moved into his father's home.[3] Two days later, on June 13, 2021, Navarro's father confronted Navarro about suspected synthetic marijuana use. A verbal altercation ensued, culminating in Navarro's father filing for, and obtaining, orders of eviction and protection the next day. The mother, who resided nearby, also obtained an order of protection against Navarro. No related charges were filed, and Navarro complied with the three orders without incident. One week after the incident, on June 21, 2021, the father opted not to renew the protective order and did not pursue the matter further.

On June 18, 2021, Navarro's probation officer notified the district court of the altercation and moved to initiate revocation proceedings based on the circumstances surrounding the altercation. The motion alleged that Navarro had violated the conditions of his release barring: (1) the use and possession of a controlled substance and (2) the commission of a new crime. Navarro contested the alleged violations.

### A. Preliminary Revocation Hearing

At Navarro's preliminary revocation hearing, the magistrate judge found no probable cause to support the alleged

---

[3] Pursuant to the conditions of his release, Navarro spent his first three months on supervision residing at a residential reentry center.

drug-related violations and dismissed them.[4]  This left the government's allegation that Navarro had violated the supervised-release condition barring the commission of a new crime.  The government advanced two theories on which the violation could be predicated: (1) that, under Puerto Rico law, the threats Navarro directed at his parents qualified as a misdemeanor "threats" offense and (2) that Navarro violated Puerto Rico law by vandalizing his mother's home.  Relying on the probation officer's in-court testimony, the magistrate found the threats-based theory supported by probable cause and allowed it to proceed.  Support for the vandalism-based theory, however, was "second or third[-]layer hearsay," so the magistrate concluded that "the interest of justice d[id] not allow [the court] to take [the alleged vandalism] into consideration as a possible ground for violating the first condition" and dismissed it.  Because of the magistrate's no probable cause findings, at the final revocation hearing, the government was limited to its theory that Navarro violated the conditions of his release by making unlawful threats.

---

[4]    When a probation officer moves to revoke supervised release, "a magistrate judge must promptly conduct a hearing to determine whether there is probable cause to believe that a violation occurred." Fed. R. Crim. P. 32.1(b)(1)(A).  If there is no probable cause, the proceeding must be dismissed.  Id. at 32.1(b)(1)(C).  If probable cause exists, a district court will hold a revocation hearing where the government has the burden of proving the violation by a preponderance of the evidence.  Id.; United States v. Whalen, 82 F.3d 528, 531-32 (1st Cir. 1996).

- 6 -

## B. Final Revocation Hearing

The court held the final revocation hearing on August 30, 2021. To prove Navarro violated a condition of his release barring any new crimes, the government sought to prove that Navarro violated Puerto Rico's law criminalizing threats resulting in determined harm.[5] As support, the government presented two witnesses, Navarro's probation officer and Navarro's mother, and submitted three voicemail recordings. There is no indication that the government ever elicited testimony from Navarro's father, although it did enter his father's account through the probation

---

[5]    Although Probation did not identify a specific offense, the parties and the court appear to have operated under the shared understanding that the new crime underpinning the alleged violation was "threats," a misdemeanor offense under Puerto Rico law. The statute provides:

> Any person who threatens one or several individuals with causing determined harm to their person or family, physical integrity, rights, honor, or patrimony will incur in a misdemeanor.

> The person will have committed a felony and a fixed term of imprisonment will be imposed to any person who threatens to commit a crime, if said threat results in the evacuation of a building, place of meeting, or public transportation facility.

Penal Code of Puerto Rico, Article 177 (certified translation of Article 177, a criminal statute currently without official published translation, as recorded in Dora Nevares-Muñiz, Código Penal de Puerto Rico 280 (4th ed. 2019)).

- 7 -

officer's testimony.[6] Navarro objected to his probation officer testifying to "what . . . [his] father told her" and asserted his "right to cross-examine [his] father." Without questioning why Navarro's father was not present or inquiring into the reliability of the hearsay testimony, the district court overruled Navarro's objection, stating "[t]he rules of evidence don't apply in revocation hearings, so denied," and admitted the testimony.

Navarro's probation officer testified that, on June 13, 2021, Navarro and his father got into a verbal altercation. She stated that during the altercation Navarro acted aggressively and made death threats that put his father "in fear for his life." She further testified that as a result, Navarro's father "filed a protection order and eviction order because he didn't feel safe with Hector Navarro being in his own home." The probation officer explained that her testimony was based on telephonic conversations with the father in the days following the incident. On cross examination, the probation officer conceded that the father "requested that [the] order [of protection] be withdrawn" one week later, when it was set to expire, because "he wasn't interested in pursuing the charges." The probation officer further added that

_____

[6] The probation officer testified that she interviewed both of Navarro's parents in the days after Navarro was evicted from his father's house and that each told her that Navarro had threatened them. She testified that the death threats occurred over a two-day period, first directed at the father on June 13, 2021, and then at the mother on June 14, 2021.

Navarro admitted to threatening his parents, but the probation officer offered no details about the substance of the purported verbal admission.

The government also questioned the mother about the incident between Navarro and his father. She testified that she spoke with the father the following day, June 14, 2021, and learned then that "they had some trouble because of [Navarro's] us[e of] potpourri and his dad filed an Order of Eviction and also a protection order" but admitted that she did not know exactly what happened. When questioned further about why the father sought the order of protection, his mother said she "believe[d] it was because of his use of the potpourri."

The mother also testified to communications she received from Navarro after his altercation with his father. She explained that "because of what [had] happened with his father, [Navarro] started calling [her] on the phone and leaving messages" accusing her of influencing his father's decision to obtain the orders of protection and eviction. Although the mother received multiple calls from Navarro, she conceded that only one contained threatening language.[7] In that call, which occurred on June 14, 2021, Navarro asked his mother "[w]hether it was because of [her]

_____

[7] In support, the government submitted several of the messages Navarro left for his mother, which the court admitted over Navarro's objection.

that the Order of Protection was filed" by his father and "in a threatening tone . . . said to tell him because he was gonna get a knife and he was going to kill his dad, kill [her], and [her] partner."

Later that day, the mother obtained her own protective order against Navarro. After the order was served on June 15, 2021, Navarro sent a final message to his mother asking "[w]hy harassment? What harassment is that?" and told his mother that she does not "know what [she's] doing . . . what [she's] getting into because the problem he had was not with [her]."

In addition to presenting evidence on Navarro's communications with his parents, the government introduced a voicemail message that Navarro left for his sister who was living in the mainland United States. Over Navarro's objection, the message was read as a real-time translation into the record. It said: "You're gonna die. And I'll take pleasure in that that you're gonna die. You and [your husband]."

The mother testified that she received the message from her daughter and had then forwarded it to Probation. She later admitted that she could not recall when her daughter sent the voicemail but speculated that it would have been after Navarro had started calling her over the incident between Navarro and his father.

In closing, Navarro argued that the government's evidence was insufficient to establish a violation of Puerto Rico's "threats" offense. Navarro argued that, even if the court were to credit the hearsay testimony, the threats as described by Probation were conclusory and lacked the definite qualities required to convict on a "threats" offense under Puerto Rico law.

In the event the court revoked his supervised release, Navarro advocated for a guidelines sentence of three to nine months. The government, in turn, requested a twenty-four-month sentence. Highlighting that it would be Navarro's second revocation for making death threats, the government argued that an above-guidelines sentence was necessary to provide a level of security to the family beyond what a protective order could offer.

Following arguments, the court found that Navarro violated the condition of his release prohibiting the commission of another federal, state, or local crime -- a Grade C violation[8] -- "by making death threats to family members as indicated in the motion filed by the probation officer and the testimony heard by the [c]ourt today." And on that basis, the court revoked Navarro's supervised release.

---

[8] Supervised release violations are categorized into three grades. U.S.S.G. § 7B1.1(a). Grade C is the least severe and covers conduct that constitutes crimes punishable by imprisonment of one year or less and violations of all other conditions of supervision that are not predicated on criminal conduct. Id.

In the colloquy that followed, the court explained "why the defendant was revoked and the factors [it] took into consideration on why the term of imprisonment was imposed." These decisions were based on its findings that "Mr. Navarro made death threats to his family members -- his mother, his father, his sister, and his sister's husband;" that "[t]he threats made to his family members caused his mother to fear for her life, as she testified today, caused his father to evict him from his house where he was living, and caused his sister to inform her mother of the threats made by Mr. Navarro;" that "threats were made to Mr. Navarro's mother including getting a gun and a knife to kill her, her partner, [his] father;" and that "Mr. Navarro's father feared for his life who then evicted [Navarro] from his house . . . [and] [m]ore threats were made to the father who didn't feel secure."

Before ending its discussion on the nature and circumstances of the violation, the court noted that:

> Mr. Navarro's father's house and his mother's house are near each other[,] in the same subdivision within five minutes walking distance of each other. [Navarro's mother] said that one of the messages that she received was received when she was not at home; when she returned home the windows and the door had been destroyed.

The court then sentenced Navarro to twenty-four months in prison, fifteen months over the top of the guidelines range, and six years of supervised release. The court elaborated:

- 12 -

The death threats made by Mr. Navarro will not be taken lightly by this [c]ourt as the conduct poses a significant and imminent risk to his family and to public safety. Mr. Navarro's behavior went against the conditions of supervised release imposed on him and showed no respect towards the [c]ourt which is why he is facing a second revocation proceeding for the same reasons he was first revoked. The [c]ourt will not tolerate this type of behavior which is in detriment not only to his family but to society as a whole.

At the end of the hearing, Navarro objected to the procedural and substantive reasonableness of the sentence. He also reiterated his belief that the court erred by considering inadmissible and unreliable evidence:

As to the threats to his father, again we didn't have an opportunity to cross-examine his father here. We don't have a written statement of him. We don't know the specifics of these threats and the [c]ourt in its ruling listed these threats in its sentence. So, Your Honor, we understand that the [c]ourt considered unreliable evidence in this case.

Navarro concluded by noting two final objections: first to the court's reference to the property damage to the mother's home, despite "nothing connecting [him] to the[] event," and second to the court's finding that Navarro made unlawful threats where they were not "real" and "determined." This timely appeal followed.

## II. Discussion

### A. Revocation

On appeal, Navarro contends that the district court's erroneous admission of his father's out-of-court statements

through the probation officer's testimony violated Federal Rule of Criminal Procedure 32.1(b)(2)(C) ("Rule 32.1(b)(2)(C)") and deprived him of his limited right to confront witnesses under the Due Process Clause of the Fifth Amendment.

Having found Navarro's claim preserved, we review the court's decision to revoke his supervised release for abuse of discretion, see Whalen, 82 F.3d at 532, and its underlying factual findings, including the "underlying finding of a violation[,] . . . for clear error," United States v. Wright, 812 F.3d 27, 30 (1st Cir. 2016). "Along the way, we draw our own legal conclusions," United States v. Colón-Maldonado, 953 F.3d 1, 3-4 (1st Cir. 2020), "mindful, though, that a material error of law always amounts to an abuse of discretion." United States v. Rodriguez, 919 F.3d 629, 634 (1st Cir. 2019).

It is well established that neither the Federal Rules of Evidence nor the Confrontation Clause of the Sixth Amendment circumscribe the admissibility of hearsay in revocation proceedings. United States v. Bueno-Beltrán, 857 F.3d 65, 67-68 (1st Cir. 2017). However, the presiding court's discretion over evidentiary decisions is not without limits. One such check is the defendant's "limited right to confront adverse witnesses both under Rule 32.1(b)(2)(C) . . . and the Due Process Clause of the Fifth Amendment." United States v. Cintrón-Ortiz, 34 F.4th 121, 124 (1st Cir. 2022). The bounds of this right are embodied in

- 14 -

Rule 32.1(b)(2)(C), which states that a defendant in a revocation proceeding may "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C); see Colón-Maldonado, 953 F.3d at 8 ("[Rule 32.1(b)(2)(C)] draws from the accused violator's due process 'right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation).'" (quoting Gagnon v. Scarpelli, 411 U.S. 778, 786 (1973))). To make such a determination, a court must balance a releasee's right to confront the witness with what good cause may exist for denying confrontation in a particular instance. Colón-Maldonado, 953 F.3d at 8. And "constructing that balance requires weighing the reliability of the hearsay statement against the reasons proffered by the government for the witness's absence." United States v. Franklin, 51 F.4th 391, 396 (1st Cir. 2022); see also United States v. Taveras, 380 F.3d 532, 536 (1st Cir. 2004) ("The court is to balance the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it. An important element of the good cause analysis is the reliability of the evidence that the Government seeks to introduce." (internal citation and quotation marks omitted)).

Navarro argues that the district court committed reversible error by (1) admitting the probation officer's hearsay

testimony without determining it was in the interests of justice to do so over his limited confrontation right and (2) relying on the improperly admitted hearsay testimony to find that Navarro had violated the terms of his supervised release. The government, for its part, concedes that the court erred by admitting the challenged hearsay testimony without determining whether it was in the interests of justice to do so but urges us to find the error harmless. See Rodriguez, 919 F.3d at 634, 636 (explaining that "a material error of law always amounts to an abuse of discretion" warranting reversal unless the error was harmless).

The government argues that the error was harmless because, even excluding the hearsay evidence, the court had "sufficient reasons to revoke Navarro's supervised release." To establish harmlessness, the government must prove, "with a high degree of confidence," United States v. Teixeira, 62 F.4th 10, 24 (1st Cir. 2023), that "considering only the non-hearsay evidence submitted to the district court, the result would have been the same," United States v. Mosley, 759 F.3d 664, 669 (7th Cir. 2014). When undertaking this analysis, we "consider the evidence in the light most favorable to the government," while paying attention to the requirement that factual findings be based on reliable evidence, and "recogniz[ing] the district court's broad legal power to determine witness credibility." United States v.

Portalla, 985 F.2d 621, 622 (1st Cir. 1993) (internal citations omitted).

Navarro points to the court's discussion of the violation as evidence that the hearsay influenced the court's decision to revoke, citing the court's express reliance on the hearsay in support of its findings and conclusions. The government does not contest that the court expressly relied on the inadmissible hearsay to find Navarro made death threats to his father. But the government also considers the reliance irrelevant where the death threats Navarro made to his mother constitute an independent basis for the revocation. We agree.

To revoke Navarro's supervised release under 18 U.S.C. § 3583(e)(3), the district court had to find by a preponderance of the evidence that Navarro committed a new federal, state, or local crime, in this case the Puerto Rico misdemeanor offense of "threats." See Teixeira, 62 F.4th at 17. To be convicted for "threats" under Puerto Rico law, the government must adduce evidence that the defendant "threaten[ed] one or several individuals with causing determined harm to their person or family." See supra note 5.

No doubt, at the hearing, the government sought to prove, and the court ultimately found, that Navarro made several unlawful threats. But this does not change the fact that committing the underlying crime requires just one unlawful threat. See id. And

here, after setting aside the threats that substantially relied on the hearsay testimony, one sufficiently supported threat remains: the threats to the mother.[9]  But Navarro challenges the independence of the court's finding, arguing that the hearsay's "narrative" colored the court's view of the phone call and influenced its finding.

---

[9]     Navarro also claims that the threats to his mother lack the requisite qualities of a prosecutable threat under Puerto Rico law and therefore cannot be the basis for his violation. Specifically, he contends that the evidence does not support a finding that his "ranting soliloquy" contained "real [or true] threats," as required under Puerto Rico law because it does not satisfy (1) the "element of immediacy" nor (2) that the "fear arising from speech directed at [his mother] [was] reasonable under the circumstances."  Given that these claims find no support in the record, we offer no more than is necessary to dispose of them.

    We begin with the immediacy requirement.  In Navarro's formulation, to be convicted of "threats" under Puerto Rico law, the state must prove "an unequivocal verbal or written manifestation of willingness to cause certain harm to a determined person or their family, and an apparent danger and restlessness to the recipient of the threat or who hears it."  But, as the government points out, Navarro's articulation of the elements lacks any reference to an immediacy requirement.  Where Navarro offers no other support for his claim that under Puerto Rico law a "threats" offense has an immediacy element, we need go no further to dispose of Navarro's sufficiency claim.  Nevertheless, even assuming the government had to prove immediacy, one could reasonably infer immediacy from the conditional nature of the threat, Navarro's declaration that he was going to get his weapons, and Navarro's relative proximity to his mother.

    Navarro's contention that the record cannot support a finding that his mother's fear was reasonable fares no better.  To the contrary, the record contains ample evidence to support the reasonableness of her fear.  On the call, Navarro blamed his mother for his situation and declared "in a threatening tone" that he was going to get a knife and kill her.  Simply put, Navarro's claims of error do not hold up against his mother's direct testimony.

While we do not dismiss the possibility that erroneously admitted evidence could have a prejudicial effect on the inferences a court draws from admissible testimony, that is not what happened in this case. Here, the threats to the mother are firmly rooted in her in-court testimony. The mother testified that Navarro said in "a threatening tone" that "he was gonna get a knife and he was going to kill his dad, kill me, and my partner." Because this was an explicit, particularized death threat, we see no merit in Navarro's claim that the taint of hearsay permeated this finding. Accordingly, the independent support for the death threats against the mother gives us a "high degree of confidence," Teixeira, 62 F.4th at 24, that the court's decision to revoke Navarro's supervised release based on the alleged violation was not influenced by its erroneous admission of the probation officer's testimony. Cf. United States v. Serrano-Acevedo, 892 F.3d 454, 461 (1st Cir. 2018). The district court's error in admitting the hearsay testimony was therefore harmless. Having found that the erroneous admission of the hearsay testimony did not affect the outcome here, we affirm the revocation of Navarro's supervised release.

## B. Sentence

We turn now to Navarro's appeal from the ensuing sentence. For committing the Grade C violation of his supervised release, the district court fixed Navarro's guidelines sentence at

three to nine months based on the nature of the violation and his criminal history score of I. From there, the court sentenced Navarro to twenty-four months in prison -- a fifteen-month departure from the top of the applicable guidelines range -- followed by six years of supervised release. On appeal, Navarro takes aim at the procedural reasonableness of his revocation sentence, arguing that the court's decision to vary upward was based on (1) unreliable, hearsay evidence regarding Navarro's alleged threats to his father and (2) clearly erroneous facts regarding his involvement in the purported vandalism. See Gall v. United States, 552 U.S. 38, 51 (2007). Having found Navarro's claims of sentencing error preserved below, we review for abuse of discretion. United States v. Soto-Soto, 855 F.3d 445, 448 (1st Cir. 2017). We address his two arguments in turn.

### 1. Reliability

First, Navarro claims that his sentence was predicated on inadmissible or unreliable testimony. Navarro makes two separate challenges to the factual underpinnings of his sentence. The first attacks the court's reliance on hearsay-dependent findings and turns on whether the hearsay testimony was properly considered at sentencing. And the second targets the court's unsubstantiated findings.

"[S]electing a sentence based on clearly erroneous facts, or failing to adequately explain the chosen

sentence -- including an explanation for any deviation from the Guidelines range," is a "significant procedural error," <u>Gall</u>, 552 U.S. at 51, warranting "revers[al] unless the government shows the mistake did not affect the sentence," <u>Colón-Maldonado</u>, 953 F.3d at 4.

We begin with the hearsay. In this circuit, we have yet to decide whether Rule 32.1's protections against the admission of hearsay evidence extend to the sentencing phase of a revocation proceeding or if the sentencing phase is governed by the general sentencing procedure of Rule 32. <u>See</u> <u>United States</u> v. <u>Torres-Santana</u>, 991 F.3d 257, 265 (1st Cir. 2021) (recognizing circuit split on the issue and declining to resolve the legal question where facts made it unnecessary to do so). And we need not do so today because although "Rule 32 provides no confrontation right and gives the court 'broad discretion to accept hearsay evidence,'" the court may only rely on hearsay if "the information has sufficient indicia of trustworthiness to warrant a finding of probable accuracy." <u>Id.</u> (quoting <u>United States</u> v. <u>Rodriguez</u>, 336 F.3d 67, 71 (1st Cir. 2003)). Indeed, a court must always "take pains to base sentencing judgments upon reliable and accurate information." <u>United States</u> v. <u>Tavano</u>, 12 F.3d 301, 305 (1st Cir. 1993). Therefore, regardless of whether Rule 32.1 or Rule 32 applies to sentencing decisions, the court failed to properly assess the reliability of hearsay evidence in sentencing Navarro.

When considering the reliability of verbal testimony, we look to the statement itself for facts that bolster the likelihood of its truthfulness and to the broader record for corroborating evidence. See United States v. Fontanez, 845 F.3d 439, 443 (1st Cir. 2017); see also Colón-Maldonado, 953 F.3d at 12. In both, we find the government has come up short.

First, the probation officer's testimony itself lacked hallmark indicia of reliability. "[W]hen a court extends a defendant's sentence based on hearsay, there must be other signs (other 'indicia of trustworthiness') to permit a reasoned conclusion that the statements are still reliable." Colón-Maldonado, 953 F.3d at 10 (citation omitted). Here, the probation officer's testimony was based on a telephone conversation with the father that occurred two months prior to the hearing. The record contains no evidence that the probation officer ever had the father reduce his statements to writing nor that the probation officer had contemporaneous notes to refresh her recollection of it. See United States v. Rondeau, 430 F.3d 44, 48 (1st Cir. 2005) (explaining that declarants reducing statements to writing bolsters reliability); Taveras, 380 F.3d at 537-38 (finding probation officer's hearsay statements concerning the probation officer's account of the violation unreliable where the probation officer had met with the witness only once, the testimony was oral, and there was no corroborating written or

physical evidence to support the hearsay). Moreover, the probation officer offered only vague and conclusory testimony of the father's account, without providing any details about the circumstances surrounding the alleged threat, the context in which it arose, or how the father responded. See Rondeau, 430 F.3d at 48; Portalla, 985 F.2d at 624.

The probation officer here simply repeated that Navarro "threatened [his father], and was being aggressive towards him," without ever stating the content of the actual threat itself. Accordingly, we find that the probation officer's testimony lacked indicia of reliability to support its probable accuracy.[10]

Moreover, the protection and eviction orders the father obtained against Navarro do not sufficiently establish the reliability of the probation officer's testimony. See Fontanez, 845 F.3d at 443 ("Objective evidence that corroborates a witness's testimony may provide persuasive proof of that testimony's reliability.").

---

[10] We are also troubled by the prospect of admitting the hearsay without giving Navarro an opportunity to probe his father's account where the record demonstrates that Navarro's father opted not to renew the protective order after one week and defense counsel represented that Navarro and his father had since reconciled. These facts, at a minimum, cast some doubt on the probation officer's testimony that the threats to Navarro's father left the father fearing for his life. See generally Tavano, 12 F.3d at 305 ("[A] court must take pains to base sentencing judgments upon reliable and accurate information.").

- 23 -

Specifically, both the probation officer and the mother testified to conversations with the father on June 14, 2021, the day he obtained the orders. Both were asked why the father decided to take this step. But only the probation officer connected the orders to Navarro's alleged death threats. The mother, on the other hand, testified that the father obtained the eviction and protection orders as a response to Navarro using a prohibited drug in his father's home. This discrepancy not only undermines the corroborating force the protective order may have otherwise had, but also underscores more generally why the record does not support a reliability finding here. See United States v. Flete-Garcia, 925 F.3d 17, 36 (1st Cir. 2019) ("[D]ue process demands that a sentencing court 'consider all the available evidence, including conflicting evidence' to 'assure itself that a piece of proof is sufficiently reliable.'" (quoting Tavano, 12 F.3d at 305)). The uncorroborated verbal hearsay therefore lacked the basic indica of reliability necessary to establish its probable accuracy. And because unreliable hearsay cannot be considered at sentencing, the court should not have allowed it during the sentencing phase of the hearing.[11] See Taveras, 380 F.3d at 537-38. The court thus

---

[11] The court also made several factual findings that are untethered from the record. At least one of those findings refers to a second incident between Navarro and his father involving "[m]ore threats." The record, however, contains no evidence of these threats. In another finding that appears to have no support

- 24 -

abused its discretion by considering the unreliable hearsay, and we must "reverse unless the government shows the mistake did not affect the sentence." Colón-Maldonado, 953 F.3d at 4.

Where, as here, it is impossible to extricate the influence of the verbal hearsay from the court's broader sentencing rationale, we cannot find the court's error harmless.

The court reasoned that the harsh sentence was necessary because the death threats "pose[] a significant and imminent risk to [Navarro's] family and to public safety." We cannot ignore the likely ways the hearsay influenced this conclusion.

First, we know from the court's own words that it placed considerable weight on the nature and frequency of the threats Navarro purportedly made to his father. But those threats were based on the probation officer's hearsay testimony and therefore cannot justify the variance. Still, other findings could explain the variant sentence such as the mother's testimony revealing the violent nature of Navarro's threats to her, the angry voicemail Navarro left for his sister, and the proximity of the violation to

---

in the record, the court purported to cite testimony from Navarro's mother that the death threats motivated Navarro's father to evict him. But Navarro's mother did not testify that Navarro was evicted because he threatened his father. For its part, the government acknowledges that these findings were erroneous but contends that they were benign misstatements that the court did not actually rely on in crafting Navarro's sentence. Where we vacate the sentence on other grounds, we need not address these findings further.

- 25 -

his release.  But even though these findings do not directly rely on the verbal hearsay, we cannot say with any certainty that the taint of the court's error did not reach them.[12]  If anything, the record suggests the inadmissible hearsay provided critical context to support several of the court's inferences necessary to make these findings.

For one thing, it is clear from the record that the June 13, 2021 incident between Navarro and his father precipitated the call where Navarro threatened his mother -- the sole basis for the violation -- and the ominous voicemail Navarro left for his sister. See supra Section II.A.  It follows that the probation officer's testimony that Navarro had put his father in fear for his life likely influenced the seriousness with which the court took Navarro's threats to his mother.  Moreover, the hearsay testimony

---

[12]    In a Federal Rule of Appellate Procedure 28(j) letter filed with the court following argument on December 13, 2022, the government argues that a recent decision interpreting Puerto Rico's "threats" offense establishes that "Navarro's statement to his mother that he would 'get a knife and . . . kill his dad, kill me [(the mother)], and [her] partner,' constituted a threat both to his mother and to his father."  It added that "[p]articularly for the sentencing phase of the hearing, the district court's conclusion that Navarro had threatened his father is supported by reliable evidence."  Regardless of whether Navarro's statement to his mother contained one threat or three under Puerto Rico law, we see nothing in the record to suggest that the court's decision to vary was based exclusively, or even primarily, on the substance of that call.  And, even accepting that Navarro's call to his mother contained threats directed at both his parents, our conclusion -- that the inadmissible hearsay influenced the sentencing outcome here -- remains unchanged.

provided support for the court's inference that the voicemail Navarro left for his sister contained a genuine threat. Indeed, the weight of the probation officer's testimony is compounded by the fact that she testified first. Therefore, the hearsay testimony regarding Navarro's alleged threats against his father inevitably dominated the court's assessment of the circumstances and colored its view of the mother's testimony.

Also of note is Navarro's observation that the revocation judgment issued by the court states that Navarro's term of supervision was being revoked for a violation -- making death threats to family members -- that ended on June 13, 2021. But the only record evidence of a threat on or before June 13, 2021 is the probation officer's testimony that Navarro threatened his father.[13] Navarro contends that the court's entry on the judgment underscores the critical role the threats directed at his father played in the court's decision to revoke his supervised release. We agree because regardless of whether this date selection was intentional (i.e., the judge wanted to signal that the revocation was based entirely on the threats to the father) or a scrivener's error (i.e., the judge did not mean to exclude the evidence of threats made to other family members), without considering conduct

---

[13] The record shows that the call where Navarro threatened his mother occurred on June 14, 2021 and the voicemail to Navarro's sister was left sometime after that.

- 27 -

postdating June 13, 2021, the record is entirely devoid of evidence justifying the upward variance imposed.

Still, the government argues that even if the court erroneously relied on findings tainted by the verbal hearsay, the error is of no consequence because the court ultimately rested the variance on the fact that Navarro was before the court on his second threats-based violation.  To be sure, Navarro's history of threatening family members likely weighed into the court's sentencing decision, as did the fact that he received a guidelines sentence for his first violation.  But, nonetheless, we cannot ignore the considerable weight the court gave to the nature and frequency of the death threats.  In particular, the court considered each threat individually when discussing the relevant conduct.  The court's focus on cataloguing the individual threats suggests that the hearsay testimony played into its assessment of the sentencing factors and therefore influenced Navarro's sentence.  See United States v. Rodríguez-Meléndez, 828 F.3d 35, 39 (1st Cir. 2016) (summarizing that erroneous factual findings affect the outcome of a proceeding when they weigh on an issue the court considered "salient" to its sentencing decision, even if the issue is not "the most important factor in [the court's] sentencing decision").  Accordingly, because of the outsized role the hearsay played in the court's factual findings, we cannot extricate its influence from the court's broader sentencing rationale.  We

- 28 -

therefore vacate Navarro's revocation sentence and remand for resentencing on the proper record.

## 2. Vandalism

We turn next to Navarro's argument that the court relied on unsupported vandalism allegations in selecting Navarro's sentence. The court, just before handing down its sentence, remarked that:

> Mr. Navarro's father's house and his mother's house are near each other[,] in the same subdivision within five minutes walking distance of each other. [The mother] said that one of the messages that she received was received when she was not at home; when she returned home the windows and the door had been destroyed.

From this, Navarro contends the court implicitly found him responsible for the damage to his mother's home and erroneously considered it "indicative of [his] dangerousness" in crafting his sentence.

The government responds that the summary of the mother's testimony could not be fairly understood as a culpability finding. In any case, the government continues, the record shows no signs that the court considered the vandalism allegation at sentencing.

The fact that the court raised these allegations just before imposing its sentence, in our view, lends strong support to Navarro's contention of reliance. That said, we stop short of finding error here where the record is ambiguous and where we have

already determined that Navarro's sentence must be vacated and the matter remanded for resentencing. We do clarify, however, that given the lack of reliable evidence to support the vandalism allegations, the court is precluded from relying on such allegations at resentencing.

### III. Conclusion

For the foregoing reasons, we affirm the district court's order revoking Navarro's term of supervision, vacate the court's sentence, and remand for resentencing consistent with this opinion.