# United States Court of Appeals
## For the First Circuit

No. 11-1249

UNITED STATES,

Appellee,

v.

JAMES MILLS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin* and Thompson, Circuit Judges.

    Richard L. Hartley, with whom Law Office of Richard Hartley
was on brief, for appellant.
    Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief, for
appellee.

March 13, 2013

_____

    * Judge Boudin heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion. The remaining two panelists issue
this opinion pursuant to 28 U.S.C. § 46(d).

**THOMPSON**, **Circuit Judge**. Based on tips from three confidential informants -- we refer to them collectively as CIs, and individually as CI-1, CI-2, and CI-3 -- federal agents in Maine suspected that James Mills had been smuggling oxycodone into the United States from Canada for some time, occasionally hiding the pills in condoms inserted into his rectum. Armed with this and other information, agents nabbed a suspiciously-acting Mills at the border on a return trip from Canada. One thing led to another and agents ended up handcuffing him to a hospital bed to monitor his impending bowel movement. Eventually he passed a condom that contained 104 80-milligram and 5 40-milligram oxycodone pills.

Mills later pled guilty to one count of importing oxycodone. See 21 U.S.C. § 952(a). At sentencing, the district court assigned him a drug quantity equivalent to 2,637 80-milligram oxycodone pills based in part on uncharged conduct described by the CIs, see U.S.S.G. § 1B1.3(a)(2), after having earlier denied his motion to force the government to disclose the CIs' names. Relying on this increased drug quantity rather than simply the 109 pills found in the condom, the court sentenced Mills to 108 months in prison, a sentence increase of seven years, Mills complains.

Mills now appeals, arguing that the court erred in denying his disclosure motion and in calculating the drug quantity. Having carefully considered his claims, we find no error and affirm.

## BACKGROUND

### A. The Events Surrounding Mills' Arrest

At approximately 6:45 p.m. on September 11, 2009, Mills entered the Lubec, Maine Port of Entry to the U.S. from Campobello Island, Canada. Tipped off by a confidential informant, law enforcement officers were awaiting Mills' arrival at the border. Upon his entry, Mills was directed for secondary inspection where Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) officers noticed he was acting nervous, avoiding eye contact, and breathing erratically. The officers asked Mills where he had been earlier; he responded he was on Campobello Island all day, but later changed his story after store receipts from St. John, New Brunswick were found in his vehicle. When the agents questioned him, Mills denied carrying pills, and a pat down and partial body search revealed none. After he refused to consent to an x-ray of his body, the agents took Mills to Calais Regional Hospital for a monitored bowel movement. Mills was handcuffed to a hospital bed and told he would stay handcuffed until he had to use the bathroom. Meanwhile, ICE officers sought a warrant and court order to conduct an x-ray and body cavity search.

The following morning at approximately 8:06 a.m., Mills agreed to an x-ray and the results indicated he had a foreign object in his alimentary canal. The ICE officers told Mills about the x-ray results and he agreed to pass the object; at

-3-

approximately 8:59 a.m. Mills passed a condom that contained 104 80-milligram pills and 5 40-milligram pills. CBP officers processed the package as evidence and found the pills in Mills' possession totaled 8.5 grams of Canadian-manufactured OxyContin, a brand of the prescription drug oxycodone.[1] A federal grand jury returned a one-count indictment charging Mills with knowingly and intentionally importing oxycodone into the U.S. on September 11, 2009, in violation of 21 U.S.C. § 952(a), and on January 7, 2010, he plead guilty as charged without a plea agreement.

## B. The Recommended Sentence and Accompanying Evidence

At the sentencing stage, the only real issue concerned the proper quantity of oxycodone for which Mills was to be held responsible. Consequently, we relate only what is necessary to place that issue into proper perspective.

Using the then-current edition of the federal sentencing guidelines, the probation office prepared a pre-sentence report (PSR) that attributed to Mills not only the 8.5 grams of oxycodone he possessed when arrested but also an additional 295.4 grams of oxycodone under the guidelines' relevant conduct provision. See United States v. Marquez, 699 F.3d 556, 558 (1st Cir. 2012) (explaining that "a defendant is responsible not only for the wrongdoing to which he pled or of which he was convicted, but also

---

[1] The pills were marked with "CDN," indicating the oxycodone was of Canadian manufacture.

-4-

for 'all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction'") (alteration in original) (quoting U.S.S.G. § 1B1.3(a)(2)). Here is how probation reached that number:

Documents offered by the government showed that Mills crossed the border from Canada into Maine 231 times between January and September 2009. They also showed that Mills converted $369,203 of U.S. currency into Canadian currency between May 2008 and September 2009. For each transaction Mills had to disclose where the cash had come from. And he claimed that the funds were payment for his work as a sea urchin diver and carpenter, for example. But the amounts he exchanged were significantly greater and inconsistent with the "legitimate" earnings he reported to probation. Also, Mills had given the names of two people who had supposedly provided him with money on the up and up, and both of them denied ever doing so, probation noted. Critically, once Mills learned about the currency exchange records, he changed his story, saying in a recorded jailhouse conversation with his girlfriend that he had been exchanging the cash for someone else and getting free drugs for his trouble. Critically too, one CI reported that Mills routinely smuggled 100 pills at a time into the U.S. in his rectum, and another said pretty much the thing.

Using the street value of oxycodone, $100 a pill, and the $369,203 in currency exchanges, probation then calculated Mills had

-5-

smuggled at least 3,692 80-milligram oxycodone pills or 295.4 grams of actual oxycodone prior to his arrest. See id. at 561 (noting that "[e]xtrapolation is a common and permissible way of attributing drugs to a defendant"). The sentencing guidelines provide a formula for converting drugs into equivalent units of marijuana for sentencing purposes: 1 gram of oxycodone is equivalent to 6,700 grams of marijuana. See U.S.S.G. § 2D1.1 cmt. n.10(E) (since recodified as cmt. n.8(D)). So 295.4 grams of oxycodone amounted to 1,979 kilograms of marijuana equivalent, which, when combined with the 8.5 grams of oxycodone Mills smuggled on September 11, brought his marijuana equivalent to 2,036 kilograms. The base offense level for at least 1,000 kilograms but less than 3,000 kilograms of marijuana is 32. See U.S.S.G. § 2D1.1(c)(4). Probation suggested a 3-level decrease for acceptance of responsibility, see U.S.S.G. § 3E1.1, and another 2-level decrease if he satisfied the test for "safety valve" relief, see U.S.S.G. § 5C1.2 -- to be eligible a defendant, among other things, must by the time of sentencing truthfully provide "the [g]overnment all information and evidence [he] has concerning the offense or offenses that were part of the same course of conduct," id. § 5C1.2(a)(5). That would give him a total offense level of 27, which, when paired with his criminal history category of I, would yield a sentencing range of 70 to 87 months in prison.

The government also asked the court to hold Mills responsible for 295.4 grams of oxycodone under the relevant conduct rubric, using the same math as probation. To avoid double counting, the government's drug-quantity estimate did not include the oxycodone seized from him on September 11. The government presented six exhibits to back up its argument. Exhibit 1 was a summary spreadsheet of records obtained from the Royal Canadian Mounted Police (RCMP) documenting Mills' 108 currency exchanges involving a total of $369,203, which he made during the 16 months before his arrest. The last documented transaction in the currency exchange records was only two days before his capture, and he made other cash exchanges on September 2, 4, and 7. Exhibit 6 was a compilation of records that supported Exhibit 1.

Exhibit 2 was the ICE report of CI-1, who reported seeing Mills with between 50 and 100 oxycodone tablets at least once a week between spring 2006 and spring 2007. CI-1 stated Mills would go to St. Andrews, New Brunswick, Canada to purchase the pills and then smuggle them into the U.S. for sale (other evidence showed) in Washington County, Maine.

Exhibit 3 was a report from the RCMP summarizing the statements of CI-2. CI-2 said Mills would first collect money from prospective U.S. buyers, convert that money from U.S. currency to Canadian currency, acquire pills from his supplier, and then return to Maine by crossing at the Lubec Port of Entry. According to

CI-2, Mills would smuggle about 100 pills at a time into the U.S. internally, via his rectum.

Exhibit 4 was an ICE report regarding an investigation that began in September 2008, after an undercover agent of the Maine Drug Enforcement Agency purchased OxyContin from CI-3. CI-3, an admitted oxycodone addict, named Mills as his or her supplier. According to CI-3, Mills would get money from his clients prior to purchasing the pills in Canada, and would then smuggle the pills by taping them to his groin area or having his girlfriend smuggle them internally. CI-3 further stated Mills would bring the pills into the U.S. by making two trips each week with 100 to 200 pills per trip. Exhibit 5 was the proffer report of CI-3, which reiterated many of the statements CI-3 made in Exhibit 4. In this proffer, CI-3 noted the pills Mills smuggled were Canadian brand OxyContin because they were labeled "CDN." CI-3 also said 80-milligram oxycodone pills sold for $80 to $100 a piece.

Wrapping up, the government stressed how consistent the CIs' accounts were with each other on the modus operandi of Mills' criminal endeavors and how the currency exchange records corroborated all this by showing his access to a large pool of money to fund his drug-buying sprees. Also, the government emphasized how Mills' employment records showed he had no legitimate means of obtaining the amounts of cash he was exchanging, noting in particular the statements of two persons whom

Mills said had given him money lawfully, who denied any such transaction.

Mills' sentencing memorandum argued the appropriate drug quantity was the 8.5 grams of oxycodone he was caught with. And he blasted the government for relying on the untested assertions of CIs in coming up with its proposed drug quantity calculation.

## C. The Identities of the CIs

At a pre-sentencing conference in July 2010, Mills' lawyer contested the use of the CIs' statements and the financial records as evidence of drug smuggling. Specifically, counsel explained his concern about the veracity of the CIs, since the government was offering their statements in support of a drug quantity that increased the amount attributable to him almost 50-fold. To bolster his argument, counsel cited a recorded jailhouse telephone conversation between Mills and his girlfriend in which they discussed how the currency exchanges were part of a money laundering scheme, and not, as the CIs' statements suggested, part of his drug trafficking. Counsel maintained this conversation called into question the reliability of the CIs' statements, particularly to determine the drug quantity attributable to Mills. Expressing concern about the court's reliance on the CIs' unrebutted claims, counsel requested disclosure of their identities in order to speak with them and potentially bring them into court.

The court stated its surprise that Mills could not determine the CIs' identities based on what had already been revealed and the presumably limited number of people involved in dealing OxyContin in Washington County, Maine. In response to Mills' argument for disclosure, the government noted two troubling incidents. First, a woman attempting to enter the U.S. from Canada had a letter from Mills on her that included pages from his PSR. Mills' letter stated the government was trying to prove additional drug quantity against him but would have trouble doing so without someone testifying against him. Second, after the government filed its sentencing memo, one of the CIs contacted ICE to report that copies of the redacted CI reports filed with the court had been published on the Facebook page of Mills and his longtime girlfriend, Jennifer Smart. The government noted that the lawyer for another of the CIs made the same complaint and that the CIs were afraid. Arguing they had an obligation to protect the informants and their identities, the government asserted that the potential for Mills to post the CIs' identities on Facebook raised significant safety concerns.

Even though the government later handed over impeaching material on the CIs, Mills moved for disclosure of their identities. Citing to Brady v. Maryland, 373 U.S. 83 (1963), he asserted he was faced with CIs making statements against him, which if adopted by the court could be "material to his punishment."

-10-

Brady held, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Id. at 87. Mills argued the "identity of these informants, then is itself evidence 'favorable to the accused' where it will allow [him] to challenge and to test these assertions," which he insisted were false.

In the conference of counsel the next day, Mills' lawyer explained disclosure was necessary for the defense to determine the accuracy of the drug quantity the government attributed to him. He argued the large amounts of money represented in the currency exchange records were attributable to his money laundering for someone in Canada, so to the extent the court was relying on the CIs' statements to determine the source of that money, the veracity of the statements would be important for the court. The court again noted its disbelief that Mills could not determine the identities of the CIs himself, based on the descriptions of their statements, and Mills' lawyer countered his client would only know who the CIs were if the statements they made were true. The government again discussed how the CIs' statements were consistent with one another and with the currency exchange records and how Mills' posting of CI information on Facebook put them at great risk. And the court warned Mills he was running the risk of not getting any adjustment for acceptance of responsibility as it

-11-

seemed what he truly wanted was the CIs' identities in order to declare them snitches to his compatriots, and have retribution taken against them.

Ultimately, the court denied the motion. The court found the CIs' statements were corroborated by other reliable evidence. Comparing Mills' need for access to the CIs with the physical danger to them, and with the danger of compromising other government investigations, as required under United States v. Tzannos, 460 F.3d 128, 139 (1st Cir. 2006), the court stressed Mills had given "no concrete reason to override the [g]overnment's interest in keeping [their] identities" under wraps. And as for Brady, the court found that case distinguishable from Mills': Mills sought disclosure at sentencing, not during trial, and Mills "made no showing that disclosure of the CIs' identities would be either material or favorable."

At the next conference of counsel, Mills' lawyer said his client would not seek safety valve relief. He also said Mills had hired a private investigator to determine the CIs' identities. And, he added, he intended to have the investigator testify at the upcoming sentencing hearing so that the court could hear what the investigator learned after talking with some suspected CIs. The court said that was okay and then ticked off the evidence that it already had: (a) Mills' admission that September 11, 2009 was not his first time smuggling OxyContin into the U.S.; (b) documents

-12-

showing "enormous amounts of cash, in excess of $300,000," that Mills had converted from U.S. to Canadian dollars; and (c) evidence showing that Mills' legitimate sources of income "don't begin to generate the kind of money" he had exchanged. Adding everything together, the court suggested it mattered not what the CIs might say. "[T]he fact that confidential informants say what I think I can infer anyway," the court stressed, "is icing on the cake."

## D. The Sentencing Hearing

Mills' sentencing hearing went forward with the identities of the CIs still secret. Conceding September 11, 2009 was not his client's first time smuggling oxycodone into the U.S., Mills' lawyer focused on the currency exchange records and argued the bulk of the money had come from an illegal source, but not from Mills' drug smuggling. Mills' private investigator explained in testimony at the hearing how Mills had hooked up with a Canadian marijuana dealer who sometimes got paid in U.S. currency and how the dealer would pay Mills in Oxycontin if he (Mills) converted that cash into Canadian currency -- at least that is what Mills' investigator claimed Mills had told him. That story squared with the recorded jailhouse telephone call between Mills and his girlfriend in which they talked about how the currency exchanges were part of a money laundering venture, Mills' investigator added. And he also testified that he questioned possible CIs, all of whom denied providing any information to law enforcement about Mills'

-13-

drug trafficking, and that he was unable to find anyone who admitted providing information about Mills to the authorities.

Cross-examined by the government, Mills' investigator noted that when he asked Mills to reveal the marijuana dealer's name, Mills said, "I'd rather not disclose that." Ultimately, the government argued nothing in the investigator's testimony necessarily undermined the evidence as to drug quantity. "[T]here is no weed dealer," the government insisted. "This is all OxyContin money." So the government urged the court to rely on Mills' admission concerning his prior smuggling and the CIs' statements describing his drug dealing history. Recognizing some differences in the CIs' stories, the government explained it was not asking the court to adopt the specific drug quantities cited in the CIs' statements, but instead to use the border patrol and currency exchange records to determine the total drug quantity.

After considering the evidence and hearing counsel's arguments, the court made a number of critical findings. For openers, the court found that Mills had crossed the border from Canada into Maine 231 times in the 8 months before his arrest. Also, the court found that the CIs' accounts fit together nicely on a number of fronts: e.g., that Mills had been smuggling OxyContin for a long time; that he would first get money from U.S. customers and then head to Canada to buy pills to smuggle back to Maine, often hiding the pills in his rectum; and that he would sneak in

-14-

about 100 pills or so each time.  "All of that," the court found, was "remarkably consistent with what we know happened on September 11, 2009."  On top of that, the court found that the frequency and amount of Mills' currency exchanges suggest the $369,203 was tied to his drug dealings.

Taking up Mills' claim that the currency exchange report reflected other sources of money besides his oxycodone trafficking, the court rejected his uncorroborated explanations.  "I do not believe the story about the major marijuana dealer using [Mills] to convert currency," the court said.  "I just don't believe it," particularly since Mills had refused to give up the dealer's name, leaving no way to verify his claim.  "We don't know the CIs' names, the court noted, but "we know what [they] have said" and so "we can compare them."  As for Mills' theory that some of the currency was payment for his work as a sea urchin diver and carpenter, the court found no proof of that, since Mills had failed to file income taxes with the federal government and his alleged employers denied paying him any cash.

Applying the correct version of the guidelines (the parties do not say otherwise), the court then took the $369,203 and Mills' preferred $140 per-pill value and arrived at a drug quantity of 1,374.4 kilograms of marijuana equivalent.  The court's math was off just a bit, though.  $369,203 divided by $140 equals 2,637.16 pills, which, at 80-milligrams each, produces 210.97 grams of

oxycodone. Multiplying 210.97 grams by 6,700 yields a marijuana equivalent of 1,413.52 kilograms, not 1,374.4 kilograms. But that mistake makes no difference to Mills, given that both numbers fall within the 1,000 to 3,000 kilograms range, which put him in base offense level 32 regardless. See U.S.S.G. § 2D1.1(c)(4). Next, the court granted Mills a 3-level acceptance of responsibility reduction. With no safety valve adjustment, Mills' total offense level was 29. That offense level, combined with his criminal history category of I, resulted in a sentencing range of 87 to 108 months. And after working its way through the factors listed in 18 U.S.C. § 3553(a), the court imposed a top-of-the-range prison sentence of 108 months.

## DISCUSSION

Training his sights on the CIs, Mills attacks his sentence on two fronts. First, he faults the court for denying his motion for disclosure, arguing that he needed to know the CIs' identities so that he could defend against the government's sentencing arguments. Second, he criticizes the court for attributing to him a drug quantity beyond the amount involved in the charged offense, contending that if the court had required disclosure of the CIs' names, he could have shown that what they had said was too unreliable for calculating relevant conduct under the sentencing guidelines. Neither persuades.

-16-

## A. Disclosure of the CIS' Identities

Police use confidential informants all the time, particularly in the murky world of drug dealings. See United States v. Perez, 299 F.3d 1, 2-3 (1st Cir. 2002). But snitching is dangerous work, and informants literally put their lives on the line by doing what they do. See id. at 3. With so much at stake, confidentiality is key. See id. And that is where the "tattler's privilege" comes in -- that is, the government's privilege to keep secret the names of persons who give law enforcement information about crimes. United States v. Robinson, 144 F.3d 104, 106 (1st Cir. 1998) (discussing Roviaro v. United States, 353 U.S. 53 (1957)).

But important as that privilege is, it is not absolute; where the disclosure of an informant's identity is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro, 353 U.S. at 60-61. One should not go overboard when reading that quote, however. The high Court could not have meant "that the privilege covers only irrelevant and unhelpful" or nonessential "evidence." See United States v. Gaston, 357 F.3d 77, 84 (D.C. Cir. 2004) (explaining why that must be so).

A disclosure inquiry is case-specific -- there is no "mechanical solution[]." Perez, 299 F.3d at 4. Starting with a presumption in favor of confidentiality, see Robinson, 144 F.3d at

106, a trial court must "balanc[e] the accused's right to prepare and present his defense against the public interest in acquiring needed information and the informant's stake in confidentiality," Perez, 299 F.3d at 4. Other factors that typically go into the mix include "the nature of the crime charged, the contours of the defenses asserted, the available means of proving the charges and defenses, and the significance of the informant's role." Robinson, 144 F.3d at 106.

The burden is squarely on the defendant to show that disclosure is essential for an adequate defense -- and it is a "heavy" one; it is not met by speculating about how useful an informant's testimony might be, for example. United States v. Cartagena, 593 F.3d 104, 113 (1st Cir. 2010) (quoting United States v. Lewis, 40 F.3d 1325, 1335 (1st Cir. 1994)). But heavy is not code for impossible. See Robinson, 144 F.3d at 106. Suppose the informant is the only person other than the defendant who has firsthand knowledge of the acts underlying the crime charged. Or suppose the informant is the only one able to amplify or contradict the testimony of a government witness. Either situation may justify disclosure, we have said. Id. (relying on Roviaro). Simplifying things somewhat, Mills has not shown how his case fits one of these scenarios. Or any other equally compelling scenario, as we shall see after applying abuse of discretion review. See id. (stressing how that standard "is quite deferential: the district

-18-

court's resolution of a disclosure request should be upheld as long as it comports with some reasonable rendition of the record").

A moment ago we noted that Mills says that knowing the CIs' names was necessary for the court's calculation of his drug quantity. The problem for him is that he does not tell us why this is so. Obviously, a defendant must spell out how an informer's testimony would help whatever defense theory he pins his hopes on. See United States v. Martinez, 922 F.2d 914, 921 (1st Cir. 1991). Mills' story seemed to change like the weather. But the one he ran with at sentencing suggested that the cash reflected in the all-important currency exchange records came either from a money laundering conspiracy involving a major-league Canadian marijuana dealer or from his work as a sea urchin diver and carpenter -- or perhaps both. Yet, devastating to his position, he whispers not even a hint that the CIs could have shed any light on this late-emerging defense. See id. (putting the onus on defendants "to provide at least some explanation of how the informant's testimony would have supported their alleged defenses").

The "heart" of the court's drug quantity analysis is the CIs' statements, Mills protests a little later in his brief. Not so. Even a quick review of the record shows that what principally drove the court's decision were (a) the 108 currency exchanges totaling $369,203 that Mills had made during the 16-month stretch

before his arrest and (b) his requested $140 per-pill price.[2] Other considerations that factored into the court's calculus included (c) Mills' agreeing that this was not the only time that he had smuggled oxycodone into the U.S.; (d) his having entered the U.S. from Canada 231 times in the 9-month period before his capture; (e) his offering no evidence that he had been legitimately employed when it mattered; and (f) his marijuana dealer tale holding no sway with the court. For simplicity we refer to all this as the "(a)-(f) factors." As for the CIs, true, their accounts about Mills' drug smuggling differed a bit. But they were remarkably in sync on the duration, method, and volume of his misadventures, and their accounts were perfectly consistent both with what had gone down on September 11 and with the full $369,203 being tied to his drug dealing ways -- as the court supportably found. Anyway, and as the court also credibly found, one could reasonably work out the drug quantity numbers using the (a)-(f) factors, without touching the CIs' narratives -- meaning their statements were merely "icing on the cake," as the court colorfully put it. In other words, the CIs' comments played a peripheral rather than a starring role in the court's drug quantity analysis,

---

[2] Remember how CI-1 said he had seen Mills with 50-100 pills every week for a year, which, using the higher number, works out to 52,000 pills -- the court did not use that figure, or the figures offered by the other CIs. Instead the court opted to divide $369,203 by $140 to get 2,637 pills -- a much smaller number than if it had used CI-1's figures, for example.

which also counts against Mills in the disclosure balancing.  See Robinson, 144 F.3d at 107.

Again, on the other side of the scale is the public interest in encouraging needed information and the informants' private interest in their safety.  See Tzannos, 460 F.3d at 139.  And here the record supports the court's finding that revealing the CIs' identities posed an obvious risk to their safety.  Recall the prior publication of the CIs' reports on Mills and Smart's Facebook page.  Recall too the veiled threat Mills sent in a letter along with copies of his PSR.  The "feds" wanted to hold him culpable for additional drug quantity, he wrote, but "[t]hey will have a hard time" doing that "without someone testifying against me."

The short of it is that the court did its job under the Roviaro line of cases, weighing the right factors, and it defensibly found that -- given Mills' weak showing on one side, and the government's interest in preserving the CIs' anonymity on the other -- the scale tipped decidedly against disclosure.  Consequently, we see nothing remotely resembling an abuse of discretion in the court's decision to deny Mills' disclosure motion.

**B. Calculation of the Drug Quantity Attributable to Mills**

Mills' second argument is a slight variation on the one we just rejected.  It goes something like this: The court, he says again, should have compelled the government to disclose the CIs' names.  Because the court did not, he quickly adds, it did not get

-21-

to see for itself how unreliable they were for the relevant-conduct calculation. Yet, he concludes, the CIs were unreliable, and taking them out of the equation means that the amount of oxycodone attributed to him should have been limited to what was in his possession at his arrest.

The law in this area is straightforward. A sentencing court can make reasonable estimates of drug quantities, provided they are supported by a preponderance of the evidence, and we review those findings deferentially, reversing only for clear error. See United States v. Bernier, 660 F.3d 543, 545-46 (1st Cir. 2011). Also, the court can consider all kinds of relevant information regardless of admissibility at trial (including hearsay that has never been tested by cross-examination), provided it has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010); United States v. Brewster, 127 F.3d 22, 27-28 (1st Cir. 1997). Last but not least, the court has considerable leeway in deciding whether particular evidence is reliable enough for sentencing purposes, and we review only for abuse of discretion. See Cintrón-Echautegui, 604 F.3d at 6; United States v. Green, 426 F.3d 64, 66 (1st Cir. 2005).

With these background rules in mind, we can make quick work of Mills' argument. For one thing, the court acted well within its discretion in denying Mills' disclosure motion, as we just saw. For another, the CIs' statements regarding Mills' modus

operandi were detailed, mutually corroborative on key points, and compatible with the events surrounding his arrest[3] -- and were therefore sufficiently reliable.  See Green, 426 F.3d at 67 (concluding that statements of confidential informants that were sufficiently detailed, internally consistent, mutually corroborative, and compatible with other information presented were sufficiently reliable); see also United States v. Ventura, 353 F.3d 84, 88 (1st Cir. 2003) (similar).  On top of all this, the (a)-(f) factors arrayed above gave the court more than enough to make a reasonable drug quantity estimate.[4]  See United States v. Hall, 434 F.3d 42, 61-62 (1st Cir. 2006) (holding that the court did not err in using the defendant's total drug profits as a basis for

---

[3] As a memory refresher for the reader, we again point out the commonalities the court supportably found among the CIs' accounts: Mills had been smuggling OxyContin for an extended time, at least since 2007; and he would collect cash from U.S. customers, exchange the money in Canada, buy pills there, and smuggle 100 or so pills back across the border by concealing them on or in his body.  And Mills' acts on or around September 11 -- e.g., his crossing the border with 109 oxycodone pills in his alimentary canal -- pretty much mirrored the drug smuggling routine that the CIs had described.

[4] Mills talks a lot about how he could have shown the CIs' unreliability if only he had had the chance to ask them questions like these: "How does he [CI-1] arrive at an estimate of 50-100 pills?  Does this same estimate apply for each time?"; "How can he [CI-2] possibly estimate the number of pills that Mills had"; "Upon what does he [CI-3] base his specific claims of the number of pills Mills was moving across the border?  If it was two trips a week at up to 200 pills, then how can it have been up to 500 pills?  For how many weeks was it 500 pills?"  But contrary to Mills' intimations, the court did not need answers to any of this:  it suffices to say that the (a)-(f) factors gave the court an adequate way to calculate drug quantity, regardless of how the CIs responded.

estimating drug quantity under the relevant conduct guideline). Ultimately, then, we see no clear error or abuse of discretion here.

## CONCLUSION

Having found no basis for disturbing the sentence imposed by the district court, we **<u>affirm</u>**.