# United States Court of Appeals
## For the First Circuit

Nos. 24-1665, 24-1666

UNITED STATES OF AMERICA,

Appellee,

v.

KELVIN GARCÍA-OQUENDO, a/k/a Kelo,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

Celso Javier Pérez Carballo, Assistant Federal Public Defender, with whom Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appellate Unit, and Rachel Brill, Federal Public Defender, were on brief, for appellant.

Maarja T. Luhtaru, Assistant United States Attorney, with whom Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and W. Stephen Muldrow, United States Attorney, were on brief, for appellee.

July 14, 2025

**BARRON, Chief Judge**. In 2024, the United States District Court for the District of Puerto Rico revoked Kelvin García-Oquendo's terms of supervised release and imposed a term of 21 months of imprisonment and a term of 18 months of imprisonment, to be served concurrently with each other. It did so because it found that he had violated the conditions of his release. García now appeals from that judgment. He contends that the District Court reversibly erred because the District Court relied on testimony that should not have been admitted under Federal Rule of Criminal Procedure 32.1(b) and the Due Process Clause of the Fifth Amendment. Although we agree that the District Court erred by admitting the challenged testimony, we conclude that the error was harmless. We therefore affirm.

## I.

## A.

In 2013, García pleaded guilty in the United States District Court for the District of Puerto Rico to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1349 and 1344, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A ("Case No. 13-299"). While awaiting sentencing on those counts, García was charged with an additional count of unauthorized use and transfer of access devices, in violation of 18 U.S.C. § 1029(a)(2) ("Case No. 15-524"). He pleaded guilty to that count in 2015.

The District Court sentenced García to a total of 89 months' imprisonment for the three convictions. It also imposed a total of five years of supervised release, comprising five years of supervised release for one of the counts from 2013, one year of supervised release for the other count from 2013, and three years of supervised release for the count from 2015, all to be served concurrently with one another. As relevant here, for each term of supervised release, the District Court imposed -- as it was required to do under 18 U.S.C. § 3583(d) -- the following condition: "The defendant shall not commit another federal, state or local crime."

**B.**

After serving his term of imprisonment, García began his supervised release terms in May 2022. In August 2023, the United States Probation Office filed a motion in the United States District Court for the District of Puerto Rico alleging that the Probation Office "ha[d] uncovered violations to the conditions of supervised release" in both Case No. 13-299 and Case No. 15-524.

The motion alleged that the Probation Office had gathered evidence "indicating that Mr. García-Oquendo is currently engaged in new criminal conduct" that "may constitute multiple Federal crimes" including identity theft under 18 U.S.C. § 1028, aggravated identity theft under 18 U.S.C. § 1028A, bank fraud in violation of 18 U.S.C. § 1344, and wire fraud in violation of 18

U.S.C. § 1343. The motion alleged that "[t]he fraudulent actions consist of gaining access, through misrepresentation and identity theft, to multiple bank products by using the identity of at least two known individuals (Margarita Castro-Lopez and Roberto C. Ortega) that did not consent for Mr. García-Oquendo to use their information to secure bank products that to this date have caused significant losses to First Bank of Puerto Rico."[1]

The Probation Office requested that the District Court "issue[] an arrest warrant" for García and schedule "a show cause hearing." García was subsequently arrested and brought before a magistrate judge in the District of Puerto Rico for an "initial appearance." Fed. R. Crim. P. 32.1(a).

The Magistrate Judge ordered García to be detained pending further revocation proceedings. See Fed. R. Crim. P. 32.1(a)(6). Pursuant to Federal Rule of Criminal Procedure 32.1(b)(1)(A), the Magistrate Judge then set a "preliminary" revocation hearing for October 2023. See Fed. R. Crim. P. 32.1(b)(1)(A) ("If a person is in custody for violating a condition of probation or supervised release, a magistrate judge

---

[1] In a different part of the motion, the Probation Officer identified three (not two) potential victims: "Roberto C. Ortega, Margarita Castro Lopez and Carlito's [sic] Ortega." The government did not present any evidence about "Carlito's Ortega" in the subsequent revocation proceedings, and as the Magistrate Judge noted during the preliminary revocation hearing, "[i]t was not clear . . . whether that's the third person or whether that's also Roberto Carlos Ortega."

must promptly conduct a hearing to determine whether there is probable cause to believe that a violation occurred.").

The preliminary revocation hearing took place on October 3, 2023, in front of the same Magistrate Judge. The government called three witnesses: (1) Jonathan Pérez-Hernandez, an investigator at FirstBank; (2) Officer Pascual Feliciano Velez of the Puerto Rico Police; and (3) Officer George Maymí Melendez, García's Probation Officer.

The government also introduced ten exhibits into evidence. These included the credit card applications used to open accounts at FirstBank under the names of Margarita Castro Lopez ("Castro") and Roberto C. Ortega ("Ortega") and images from surveillance cameras at various ATM machines. Neither of the alleged victims, Castro or Ortega, testified.

Based on the evidence, the Magistrate Judge found probable cause "certainly as to all of the allegations that pertain to the credit card . . . of Mr. Ortega," but "no probable cause as to the allegations concerning the credit card for Ms. Castro." The Magistrate Judge then referred the revocation proceedings "to the presiding District Judge for a final revocation hearing." See Fed. R. Crim. P. 32.1(b)(1)(C) ("If the judge finds probable cause, the judge must conduct a revocation hearing.").

The "final revocation hearing" took place in the District Court on April 8, 2024. The government presented the same three witnesses and introduced the same ten exhibits as in the preliminary revocation hearing. Again, neither Castro nor Ortega testified.

Pérez, the FirstBank investigator, testified first. He testified that the bank's fraud department had "found some suspicious activity" regarding credit cards under the names of Ortega and Castro. Specifically, he testified that a number of payments had been made toward these credit cards from bank accounts at Banco Popular and Oriental, all of which were later "reversed" either due to insufficient funds or because the account owners had never authorized the payments.

Pérez also identified García as "the primary suspect" behind these activities because the telephone number and mailing address listed in the application to create the account under Castro's name "matched" the contact information García had previously provided to FirstBank in his application to create an account under his own name. He further testified that Castro's credit card account had "an authorized credit card number under the name of Kelvin García[]." As to Ortega's credit card application, Pérez testified that it did not contain the same

telephone number and mailing address as García's, but did contain the same physical address as the one used in the application for Castro. Pérez then testified that he interviewed Ortega.

At that point, defense counsel objected "to anything that [Ortega] allegedly said." Defense counsel did so on the ground that "Mr. García has confrontation rights under the Federal Rules of Criminal Procedure 32.1(b)(2)(C)."

The District Court denied the objection, agreeing with the government that the objection goes to "weight" not admissibility and further reasoning that "the Rules of Evidence" do "not necessarily" apply to "these types of procedures." With defense counsel's objection overruled, Pérez proceeded to testify that Ortega told him that Ortega was "a victim of ID theft." Pérez further testified that, when he showed Ortega a photograph of García withdrawing a cash advance from an ATM machine from Ortega's credit card account, Ortega told him that Ortega did not know García.

The government subsequently called Officer Feliciano of the Puerto Rico police to the stand. Officer Feliciano testified that he examined the credit card accounts belonging to Ortega, Castro, and García at FirstBank. He testified that the credit card applications under Castro's name and García's name had the same mailing address. And he testified that García admitted at the time of his arrest that the address was his "private" mailing

address and that the United States Postal Service had "certifie[d]" that the address corresponded to García. Officer Feliciano then identified and described a photograph depicting García conducting a transaction at an ATM from an account belonging to Castro. Officer Feliciano also testified that he interviewed Castro.

When the government asked about what Castro told the officer, defense counsel again made a "hearsay objection as to what [Castro] allegedly said," contending that "[s]he could be here, and the Government had ample time." The District Court overruled the objection.

Officer Feliciano proceeded to testify that Castro told him that "[s]he did not authorize [García]" to open an account in her name and that "[s]he did not know [García]." As to the account under Ortega's name, the officer testified that an image depicted a man withdrawing cash from an ATM from the FirstBank account under Ortega's name. The same officer further testified that García had recognized the man upon seeing the photo and described him as a "junkie that used to hang out in the gas station in the neighborhood to whom [García] used to give some bucks so that he would do some transactions for [García] using the card."

Officer Feliciano then described photos depicting García withdrawing cash from the FirstBank account under Ortega's name on three separate occasions. Officer Feliciano testified as well that he interviewed Ortega and that Ortega provided him with a

sworn statement which stated that "[Ortega] does not have any account with FirstBank, never has had any accounts with FirstBank, and did not authorize anybody to open an account under his name."

Probation Officer Maymí was the final witness for the government. Officer Maymí testified that he had also interviewed Ortega, who told the officer that "he didn't know [García]" and did not authorize "that any business be conducted in his name." He further testified that the mailing address used to open both the account under García's name and the account under Castro's name matched the address that García had shared as his new address following an address change.

García did not present any witnesses.

## 2.

At the close of the evidence, defense counsel argued that the government had not met its burden to prove, by a preponderance of the evidence, that García had committed the alleged violations of the conditions of his supervised release. In particular, defense counsel "affirm[ed] our objection under . . . Rule 32.1(B)(1)(b), which provides [García] with the opportunity to question adverse witnesses at his final revocation hearing." Defense counsel repeated that the out-of-court statements of Ortega and Castro should have been excluded under that rule. And without the "impermissible hearsay," defense counsel argued, the government had not proven that García lacked

authorization from Ortega and Castro to act on their behalf, which the defense contended was an essential element of the alleged crimes.

The government contended that it had proven "at least a felony in this case." As to Ortega, the government contended that Ortega "emphatically denie[d] to everyone who spoke to him that he has ever had an account at First Bank," pointing to the testimony of all three witnesses to this effect. The government also relied on the photographs of García withdrawing cash from the account under Ortega's name at various moments.

As to Castro, the government highlighted the fact that the credit card application under Castro's name showed the same mailing address that García had reported to the probation officer. It also noted that Castro told several witnesses that "[she] never authorized [García] to do anything on their behalf."

The District Court determined that "the Government has met the burden of establishing by preponderance that the Defendant has been engaged in [criminal conduct]." Listing the offenses that the government had alleged García committed while on supervised release, the District Court stated that it "[did]n't need to go and dwell into every specific element[] of the offense, aside from determining that [García's] conduct . . . amounts to a series of possible felony offenses under State or Federal law." In support of its conclusion that the defendant had engaged in

such conduct, the District Court first explained that, even though FirstBank had "corroborated" the credit card applications of both Ortega and Castro, those accounts "were opened online" instead of being "personally done."

The District Court further emphasized the testimony from Probation Officer Maymí, which it said showed that "the [address] provided by the Defendant to the bank as the mailing address for the two fraudulently made bank loan applications" was "consistent with" "the one that is given as the new address of the Defendant to the probation officer."[2]  The same address, the District Court explained, had been "verified by the postal inspectors as the address for this Defendant."  The District Court further relied on the photographs "clearly depict[ing]" the defendant withdrawing cash from the accounts of Ortega and Castro and the fact that one of those photographs, by the defendant's own "admission[]," showed a withdrawal by "an addict that used to hang out at the gas station that [the defendant] paid a couple of dollars for him to conduct the transactions."

---

[2] Contrary to the District Court's statement, the mailing address on Castro's account matched García's address but the mailing address on Ortega's did not.  García, however, does not challenge any potential error in this regard.  Moreover, for reasons explained below, the other evidence on which the District Court relied strongly supported its violation finding as to both Castro and Ortega.

Given these features of the record, the District Court concluded that the government had met its burden of proving, by a preponderance of the evidence, that García had violated the condition of his supervised release terms that he not commit another offense. As a result, the District Court "determined that there is a basis to revoke" both terms of supervised release. The District Court, however, "continue[d] the sentence for a month," in light of the government's representation to the court that it would be presenting criminal charges to the grand jury for García's alleged criminal conduct.

**3.**

After granting an additional continuance at the request of the parties for plea agreement negotiations, the District Court imposed the terms of imprisonment for García's supervised released revocations on June 21, 2024. The District Court started off by noting that, based on the evidence presented at the April 8, 2024 hearing, it had found "conduct that amounts to bank fraud and identity theft."

The District Court then heard from the parties. Defense counsel began by stating that she "would like to renew [her] objections from the revocation hearing, including our position that there is not enough evidence to revoke." She then "provide[d] some additional mitigating information." The government, for its part, recommended that the District Court impose a term of 24

months of imprisonment on the grounds that García was "a repeat offender."

The District Court then calculated García's advisory guideline ranges for his violations of the conditions of his supervised release terms. As to García's violation of the condition of his supervised release term in Case No. 15-524, the District Court calculated a guideline range of 15 to 21 months. As to García's violation of the condition of his supervised release term in Case No. 13-299, it calculated a guideline range of 12 to 18 months.

The District Court also considered the factors in 18 U.S.C. § 3553(a)(2)(A) and (D) as well as "the nature and circumstances of the offense" and "the sentencing objectives." Among other things, the Court noted that the evidence presented indicated that "there [we]re multiple victims involved, including common citizens and a bank institution." The District Court imposed a term of 21 months of imprisonment in Case No. 15-524 and 18 months for Case No. 13-299, to be served concurrently with each other.

After the District Court determined the terms of imprisonment, defense counsel objected. In doing so, she stated, "[W]e renew our objections as to the [C]onfrontation [C]lause and hearsay that occurred during the hearing."

García filed this timely appeal.

**II.**

We review a district court's "ultimate revocation decision and sentence for 'abuse of discretion.'" United States v. Colón-Maldonado, 953 F.3d 1, 3 (1st Cir. 2020) (quoting United States v. Wright, 812 F.3d 27, 30 (1st Cir. 2016)). "Along the way, we draw our own legal conclusions," id. at 3-4, and we review "the underlying finding of a violation of supervised release for clear error," Wright, 812 F.3d at 30.

**III.**

The only grounds that García presses on appeal for challenging the revocations of his supervised release terms are that the District Court relied on testimony that should not have been admitted under Federal Rule of Criminal Procedure 32.1(b) and the Due Process Clause of the Fifth Amendment. Therefore, we address only those grounds.

A defendant in a supervised release revocation hearing enjoys "a limited right to confront adverse witnesses" under both Rule 32.1[3] and the Due Process Clause of the Fifth Amendment.

---

[3] Rule 32.1(b)(1)(B)(iii) provides for this right at the preliminary revocation hearing and states that a magistrate judge "must give the person . . . upon request, an opportunity to question any adverse witness, unless the judge determines that the interest of justice does not require the witness to appear." Rule 32.1(b)(2)(C) provides for this right at the final revocation hearing and states that a "person is entitled to . . . an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear."

- 14 -

United States v. Cintrón-Ortiz, 34 F.4th 121, 124 (1st Cir. 2022). Under those provisions, "a court must balance a releasee's right to confront the witness with what good cause may exist for denying confrontation in a particular instance." United States v. Navarro-Santisteban, 83 F.4th 44, 52 (1st Cir. 2023). Based on these protections, García contends that the District Court erred in revoking his supervised release term because its finding that he had violated the condition of his supervised release relied on testimony that was based on interviews with people who did not testify at the revocation hearing and thus were not available for cross examination by him.

García directs his challenge to the testimony from Pérez, Officer Feliciano, and Officer Maymí,[4] which introduced Ortega's and Castro's out-of-court statements that they did not authorize García to act on their behalf with regard to the credit card accounts under their names at FirstBank. García contends that the District Court erred by allowing these witnesses to testify as to the out-of-court statements of Ortega and Castro without "conduct[ing] a proper balancing under [Federal] Rule [of Criminal Procedure] 32.1 and the Due Process Clause."

---

[4] García did not object below to the testimony from Officer Maymí. But, because the government concedes that "García preserved an objection based on [Rule 32.1]," we treat the issue as preserved as to all of the witnesses' testimony.

- 15 -

The government does not dispute that the District Court failed to conduct the required balancing under Rule 32.1 before admitting the challenged hearsay. Instead, it contends that any such error was harmless.

To demonstrate harmlessness here, "the government must prove, 'with a high degree of confidence,' that 'considering only the non-hearsay evidence submitted to the [D]istrict [C]ourt, the result would have been the same.'" Navarro-Santisteban, 83 F.4th at 53 (first quoting United States v. Teixeira, 62 F.4th 10, 24 (1st Cir. 2023); then quoting United States v. Mosley, 759 F.3d 664, 669 (7th Cir. 2014)). We have found such errors to be harmless where evidence other than the challenged hearsay "strongly supports" the District Court's violation finding. Cintrón-Ortiz, 34 F.4th at 125.

In finding that García had engaged in new criminal conduct and thus violated the conditions of his supervised release terms, the District Court never explicitly mentioned the challenged hearsay testimony. Instead, the District Court justified its violation finding by pointing to the other circumstantial evidence in the record, including the fact that both Ortega and Castro's accounts were opened online, the fact that García's mailing address was used to open Castro's account, the surveillance images showing García withdrawing funds from both accounts, and the surveillance images showing a different

- 16 -

individual withdrawing cash from Ortega's account and García's admission that the individual was a local drug addict that García had paid to make ATM transactions on his behalf from Ortega's account.

The record also showed that bank accounts linked to García were used to make payments on both Ortega's and Castro's accounts, all of which were reversed either for insufficient funds or for lack of authorization. These so-called "reverse payments" allowed transactions to be made with Ortega and Castro's credit cards above the pre-set credit card limits.

The totality of this evidence gives us a "high degree of confidence" that, setting aside Castro and Ortega's out-of-court statements, the District Court's decision to revoke García's supervised release would have been the same. Teixeira, 62 F.4th at 24. The unchallenged evidence "strongly supports" the inference that García lacked authorization from both Ortega and Castro to conduct those transactions. Cintrón-Ortiz, 34 F.4th at 125; see Teixeira, 62 F.4th at 25 ("To conclude that a supervised release violation has occurred, 'the district court need not point to direct evidence but, rather, may rely on reasonable inferences drawn from the evidence.'" (quoting United States v. Rodriguez, 919 F.3d 629, 637 (1st Cir. 2019))). And García does not dispute that, if he lacked authorization from either Ortega or Castro, his conduct would have constituted identity theft, see 18 U.S.C.

§ 1028(a)(7), aggravated identity theft, see id. § 1028A(a)(1), wire fraud, see id. § 1343, and bank fraud, see id. § 1344.

For these reasons, even assuming that the District Court relied in any respect on the challenged testimony in finding that García violated the conditions of his supervised release terms by committing another federal crime, we see no reversible error. We thus reject García's challenges to the District Court's violation finding insofar as those challenges are based on either Rule 32.1 or the Fifth Amendment.

**IV.**

García separately contends that the terms of imprisonment that the District Court imposed as a consequence of the revocations cannot stand because the District Court relied on the same challenged hearsay testimony in determining the terms of imprisonment. García contends that, when the District Court imposed terms of imprisonment at the top of his guidelines ranges, it "made clear that it relied on this hearsay -- and the fact that Mr. García's actions affected 'multiple victims . . . including common citizens.'" (Alteration in original). He therefore argues that it was error for the District Court to do so because Rule 32.1's protections extend to the "sentencing phase" of a revocation proceeding.

**A.**

The government first contends that this claim of error is subject to plain error review because García "did not argue before the district court that it should have applied Rule 32.1's protections at the sentencing-stage of the hearing." The government then goes on to argue that García waived this claim on appeal because he failed to argue plain error in his opening brief. We do not agree.

When the parties reconvened for the District Court to determine the terms of imprisonment for García's violations of his supervised release terms, defense counsel began her argument by "renew[ing]" her objections from the earlier hearing. After the District Court handed down its sentence, defense counsel then again stated, "[W]e object -- we renew our objections as to the [C]onfrontation [C]lause and hearsay that occurred <u>during the hearing</u>." (Emphasis added).

Notably, those objections occurred during the second hearing in front of the District Court. They thus occurred after it had already found in an earlier hearing that García had violated the conditions of his release and when all there was left to do was determine the terms of imprisonment for the revocations of his release. Accordingly, those objections preserved García's claim that the District Court should not have relied on the challenged hearsay testimony in determining the terms of imprisonment for

García's revocations.  See United States v. Rivera-Berríos, 968 F.3d 130, 134 (1st Cir. 2020) (holding that an "objection need not be framed with exquisite precision" to preserve a claim for appellate review); United States v. Colón-Cordero, 91 F.4th 41, 49 (1st Cir. 2024) (holding that an objection may "callback" to earlier arguments before the district court).

**B.**

As to the merits, the government contends that "although Rule 32.1(b)(2) applies in the guilt or violation-determination phase of a supervised release revocation hearing, it does not apply in the sentencing phase of the revocation hearing."  Thus, the government argues, "to the extent the [D]istrict [C]ourt did consider the testimony regarding Ms. Castro's and Mr. Ortega's statements, it did not err in doing so."  And, in any event, the government contends, any Rule 32.1 error was harmless because "even without Ms. Castro's and Mr. Ortega's hearsay statements . . . all the other evidence shows that García had multiple 'common citizen' victims.'"

We start with the government's claim that there was no error at all, which we reject.  We then address its contention that any error was harmless, which we conclude is persuasive.

**1.**

We have "yet to decide whether Rule 32.1's protections against the admission of hearsay evidence extend to the sentencing

- 20 -

phase of a revocation proceeding." Navarro-Santisteban, 83 F.4th at 55. Other circuits have split on the issue. Compare United States v. Combs, 36 F.4th 502, 506-07 (4th Cir. 2022) (holding that Rule 32.1's confrontation right applies to the sentencing phase of revocation proceedings), with United States v. Ruby, 706 F.3d 1221, 1226-28 (10th Cir. 2013) (holding that Rule 32.1's confrontation right does not apply to the sentencing phase of revocation proceedings); cf. United States v. Busey, 11 F.4th 664, 668 (8th Cir. 2021) ("Due process generally does not require confrontation during sentencing following a conviction, and due process does not require any greater protection in the sentencing phase of a revocation proceeding." (internal citation omitted)); United States v. Williams, 847 F.3d 251, 254 (5th Cir. 2017) (holding the same). We now hold that Rule 32.1(b)(2)(C)'s limited confrontation right applies to the entirety of the revocation proceeding, both in the determination of whether the releasee has violated the conditions of supervised release and in the determination of whether to revoke supervised release and impose a term of imprisonment.

To set the stage for understanding the dispute between the parties as to whether Rule 32.1's limited confrontation right applies to the entirety of the revocation hearing, we briefly review the relevant legal landscape concerning the procedural guarantees that apply to the various stages of criminal proceedings

that are brought against criminal defendants like García. We then circle back to the parties' contentions about whether Rule 32.1's limited confrontation right applies both in the determination of whether a releasee has violated the conditions of his supervised release and in the determination of whether to revoke and impose a term of imprisonment.

**i.**

The Sixth Amendment "identifies the basic rights that the accused shall enjoy in 'all criminal prosecutions.'" Martinez v. Ct. of Appeal of Cal., Fourth App. Dist., 528 U.S. 152, 159-60 (2000) (quoting U.S. Const. amend. VI). One such right is the right of the accused to "be confronted with the witnesses against him." U.S. Const. amend. VI.

"[T]he protections provided by the Sixth Amendment are available only in 'criminal prosecutions.'" United States v. Ward, 448 U.S. 242, 248 (1980). Thus, there is no Sixth Amendment Confrontation Clause right at sentencing, United States v. Luciano, 414 F.3d 174, 179 (1st Cir. 2005), or in a supervised release revocation proceeding, United States v. Rondeau, 430 F.3d 44, 47-48 (1st Cir. 2005).

Nonetheless, the Due Process Clause of the Fifth Amendment "secures . . . the right of criminal defendants to 'fundamental fairness' in the proceedings that are brought against them." United States v. Jackson, 58 F.4th 541, 553 (1st Cir. 2023)

- 22 -

(quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982)). As a result, although a court at sentencing may generally rely on hearsay evidence without violating due process, see Williams v. New York, 337 U.S. 241, 249-52 (1949), the hearsay evidence must still have "sufficient indicia of reliability to support its probable accuracy," Colón-Maldonado, 953 F.3d at 10 (quoting United States v. Mills, 710 F.3d 5, 15 (1st Cir. 2013)).

Moreover, in Morrissey v. Brewer, 408 U.S. 471 (1972), the Supreme Court of the United States held -- in the context of a parole revocation -- that even though a releasee facing revocation does not have "the full panoply of rights due a defendant" in a criminal prosecution, the releasee still is entitled to "the minimum requirements of due process." Id. at 480, 488-89. And, Morrisey made clear, one such right is the right "to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." Id.

Notably, as other courts have recognized, Rule 32.1 was enacted to codify the limited confrontation right for releasees facing revocation that Morrissey recognized as a matter of due process. See Ruby, 706 F.3d at 1226; Combs, 36 F.4th at 506. That is also clear from the Advisory Committee Notes to the Rule. See Fed. R. Crim. P. 32.1 advisory committee notes (2002).

The question, then, is whether there is any basis for concluding, as the government contends, that Rule 32.1's limited confrontation right does not apply to the so-called "sentencing phase" of revocation proceedings -- which concerns the consequences for violating a condition of release -- even though it applies to the so-called "guilt phase" -- which concerns whether a violation has occurred. In pressing the argument that Rule 32.1's limited confrontation right applies only to the so-called "guilt phase," the government chiefly relies on the Tenth Circuit's decision in Ruby, 706 F.3d 1221. But, as we will next explain, we cannot agree.

**ii.**

Ruby held that the confrontation right provided for in Rule 32.1(b)(2)(C) applies to the so-called "guilt phase" but not to the so-called "sentencing phase." Id. at 1227-28. In so holding, Ruby reasoned that "nothing in Rule 32.1 requires that the hearsay evidence at issue here be subject to a different, or higher, level of admissibility than it would be at other types of sentencing proceedings." Id. at 1228. Ruby concluded that because there is "no meaningful difference between sentencing at a revocation proceeding and sentencing after a guilty plea or jury verdict of conviction," id. at 1227, the "sentencing phase" of a revocation hearing should be governed by Rule 32, which everyone

agrees applies to sentencing after conviction and does not contain a limited confrontation right, rather than by Rule 32.1.

This rationale works, however, only if Rule 32.1 impliedly distinguishes between a "guilt phase," at which its confrontation right applies, and "a sentencing phase," at which the right does not. We see no basis, however, for reading Rule 32.1 to treat the term of imprisonment that a court imposes upon revocation of a supervised release term as a "sentence" insofar as that suggests the term of imprisonment is a separate "sentence" to the one imposed after conviction for the original offense. When a court decides to revoke a releasee's supervised release and imposes post-revocation sanctions, it does not impose a separate "sentence." See Johnson v. United States, 529 U.S. 694, 700 (2000). Rather, as the Supreme Court explained in Morrissey, 408 U.S. at 479-80, everything that occurs during a revocation hearing constitutes "a revocation decision," to which Rule 32.1(b)(2)(C)'s limited confrontation right applies.

Consistent with this conclusion, courts have explained that "supervised release is a separate part of the original sentence." United States v. Robinson, 62 F.3d 1282, 1286 (10th Cir. 1995). It is thus hardly evident that it makes sense to treat only one "phase" as pertaining to sentencing. Indeed, we treat "post[-]revocation sanctions as part of the penalty for the initial offense." Johnson, 529 U.S. at 700; see also 18 U.S.C.

§ 3583(e)(3) (providing that the term of imprisonment that may be imposed upon revocation cannot be longer than the term of supervised release the court could have originally imposed).

Not surprisingly, therefore, nothing in the text of the Rule draws a sentencing-phase/guilt-phase distinction. See Combs, 36 F.4th at 506. Indeed, Rule 32.1(b)(2) is titled "Revocation Hearing," and the government does not dispute that revocation hearings involve both the determination of whether there has been a violation of the conditions of release and the determination of the consequences for such a violation.

Subsection (b)(2)(E) of the Rule accords with this same conclusion. It provides that a person facing revocation must have "an opportunity to make a statement and present any information in mitigation." Fed. R. Crim. P. 32.1(b)(2)(E). The Advisory Committee Notes explain that this subsection was added to "explicitly recognize[]" the right of "allocution" at "Rule 32.1(b)(2) revocation hearings." Fed. R. Crim. P. 32.1 advisory committee's note to 2005 amendment. The right to present mitigating evidence and the right of allocution, of course, relate to sentencing. "That Rule 32.1(b)(2) lists the right to allocution together with the rights to the disclosure of evidence and to question adverse witnesses in a single list of procedural protections -- drawing no distinction between the guilt and sentencing phases of a revocation hearing -- indicates strongly

that the Rule applies to the entire proceeding." Combs, 36 F.4th at 506.

Nor, as a practical matter, does our conclusion on this score produce an anomalous outcome. The so-called "guilt phase" during a revocation proceeding is not "comparable" to the "guilt phase" in a criminal proceeding. Id. at 507. While, in the context of a criminal conviction, it may make sense to provide greater procedural protections to a defendant "when [the court] has to decide whether someone is guilty and must go to prison [rather] than when it is deciding how long a convicted criminal must serve," United States v. Littlesun, 444 F.3d 1196, 1200 (9th Cir. 2006), the same reasoning does not apply in the revocation context, where "the most meaningful consequences for a releasee come" not when a court decides whether the releasee has violated the condition of his release but "when a court decides whether to revoke the terms of supervised release and impose additional prison time," Combs, 36 F.4th at 507; see also id. (noting that a criminal conviction carries with it "societal stigma and, often, the loss of civil rights like the rights to vote and serve on a jury" whereas the finding of a violation of a supervised release term "involves few, if any, of these collateral consequences").

In fact, Morrissey grounded the "procedural guarantees" it identified, including the limited confrontation right, in the "need[] . . . to assure that the finding of a parole violation

will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." 408 U.S. at 484 (emphasis added). Morrissey explained that "a revocation decision" resolves both "a wholly retrospective factual question" about whether a violation of the conditions of supervised release has taken place and a "factual but also predictive and discretionary" question about whether to revoke release and the penalty to be imposed upon revocation. Id. at 479-80. And it explained that "this second step, deciding what to do about the violation once it is identified," also "depends on facts, and therefore it is important for the [presiding officer] to know not only that some violation was committed but also to know accurately how many and how serious the violations were." Id. at 480. Thus, Morrissey suggests that the limited confrontation right it recognized -- and Rule 32.1(b)(2)(C) codified -- applies to the entirety of the "revocation decision," including the determination of whether to revoke supervised release and impose a term of imprisonment.

We therefore reject the government's suggestion that the confrontation right provided for in Rule 32.1(b)(2)(C) does not apply to the entirety of such "a revocation decision," because, prior to the so-called "sentencing phase," that Rule's limited confrontation right applies, but, at the "sentencing phase," it does not. Accordingly, we hold that Rule 32.1's limited

- 28 -

confrontation right applies to the entirety of the revocation proceeding.

## 2.

Notwithstanding our holding that Rule 32.1's limited confrontation right applies to the entirety of the revocation proceeding, we must conclude that any Rule 32.1 error was harmless on this record. To be sure, in imposing the sentence, the District Court relied on its finding that "there [were] multiple victims involved, including common citizens and a bank institution." But, insofar as the District Court relied on the challenged out-of-court statements by Ortega and Castro in making that finding, for reasons we have already explained, the other evidence in the record "strongly supports" the District Court's finding that Ortega and Castro (as well as FirstBank, which administered both accounts) were victims of García's criminal conduct. Cintrón-Ortiz, 34 F.4th at 125. Thus, to the extent the District Court relied on the challenged hearsay to determine the terms of imprisonment for the revocation of García's supervised release, any resulting Rule 32.1 error was harmless.

Our conclusion on this score also requires us to reject García's separate contention that the District Court erred in considering the challenged hearsay in determining García's post-revocation sanctions because the District Court failed to analyze whether the hearsay was supported by sufficient "indicia

of trustworthiness" and because "it would have been an abuse of discretion for the district court to find" the hearsay evidence to be supported by sufficient "indicia of trustworthiness." For, even assuming that the District Court erred in this regard, any such error was harmless for the same reasons that any Rule 32.1 error was harmless -- namely, any finding that relied on the challenged testimony was strongly supported by the other evidence in the record.

**V.**

For the reasons given above, we **affirm** the District Court's revocation order and sentences.